KARAM v LAW OFFICES OF RALPH J KLIBER

Docket No. 225505. Submitted January 9, 2002, at Detroit. Decided October 8, 2002, at 9:05 A.M. Leave to appeal sought.

Carole and David Karam, as joint personal representatives of the estate of Abraham Karam, Jr., deceased, and as cotrustees of the Abraham Karam, Jr., trust agreement, and Carole Karam individually, as a beneficiary of the decedent's estate, brought an action in the Wayne Circuit Court against the Law Offices of Ralph J. Kliber, Ralph J. and Thomas P. Kliber, and National Bank of Detroit, alleging legal malpractice resulting from erroneous legal and tax advice concerning the decedent's estate plan. The court, Jeanne Stempien, J., granted summary disposition in favor of the defendants, finding no inconsistency within the relevant trust documents and that the plaintiffs were barred from using extrinsic evidence to establish that the decedent's intent was different from that reflected in the documents. The plaintiffs appealed.

The Court of Appeals *held*:

1. The court properly found that the extrinsic evidence that the plaintiffs sought to use was inadmissible to show that the decedent's intent differed from that plainly expressed in the trust.

2. Beneficiaries may not introduce extrinsic evidence to show that the decedent intended an outcome different from that clearly set forth by the language of the estate documents.

3. The decedent's intent was clearly expressed in the trust. The trust fulfills the intent of the settlor as expressed in that document.

4. Personal representatives may not rely on extrinsic evidence to dispute a settlor's intent that is clearly expressed in the estate plan documents.

Affirmed.

DECEDENT'S ESTATES — TRUSTS — EVIDENCE.

Personal representatives of a decedent's estate and trustees of a trust established by a decedent may not use extrinsic evidence to show that the decedent's intent was different from that clearly set forth by the language of the relevant estate documents; the beneficiaries of estate plan documents likewise may not introduce extrinsic evi-

dence to show that the decedent intended an outcome different from that clearly expressed in the documents.

*Sullivan, Ward, Bone, Tyler & Asher, P.C.* (by *Ronald S. Lederman* and *Craig S. Thompson*), for the plaintiffs.

*Lipson, Neilson, Jacobs & Cole, P.C.* (by *Phillip E. Seltzer* and *C. Thomas Ludden*), for Law Offices of Ralph J. Kliber and Ralph J. and Thomas P. Kliber.

*Henry J. Shymanski* (*Daryl Royal* of counsel) for National Bank of Detroit.

Before: HOOD, P.J., and MURPHY and MARKEY, JJ.

MARKEY, J. In this legal malpractice action, plaintiffs appeal by right the trial court's order granting summary disposition in favor of defendants.[1] We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs Carole Karam and David Karam sued defendants Kliber and NBD for providing allegedly erroneous legal and tax advice concerning an estate plan for the decedent, Abraham Karam, Jr., that plaintiffs claim resulted in a large federal estate tax liability upon the decedent's death. The estate plan consisted of a last will and testament and a revocable trust (including amendments) with the decedent as the settlor and trustee. Upon his death, Carole Karam, the decedent's surviving spouse, and David Karam, one of the decedent's children, became the cotrustees of the decedent's trust and were appointed as the

---

[1] Defendants Law Offices of Ralph J. Kliber, Ralph J. Kliber, and Thomas P. Kliber are referred to collectively as "defendants Kliber" while defendant National Bank of Detroit is referenced as "NBD."

joint personal representatives of his estate. They brought this action on behalf of both the trust and the estate, and Carole Karam also joined the action as a beneficiary of the decedent's estate.

A somewhat basic overview of federal estate tax law[2] is helpful to an understanding of this case. In the vast majority of cases, no estate tax is due upon a person's death if he leaves his assets to a surviving spouse or others. There are two principal reasons for this. First, the estate tax is intended for wealthy individuals; the estate tax system has a built-in tax credit that corresponds to an amount that is excluded from taxation. In this context, the "unified credit" refers to a credit on the amount of otherwise payable tax. The "applicable exclusion amount" or "credit equivalent" refers to the monetary value of the person's assets that, if subject to tax, would result in a tax equal to the unified credit amount. The actual unified credit amount, and thus the corresponding credit equivalent in assets, has varied over the years. At the time of the decedent's death, the allowable unified credit was $192,800, which, in effect, exempted from tax an asset amount of $600,000. Thus, at that time, if a person died having less than $600,000 in assets, his estate would not owe any federal estate tax, regardless of to whom he left his estate.

A second principal reason that a person might not owe federal estate taxes upon death is the existence of an "unlimited marital deduction." The estate tax scheme allows for an automatic deduction for all

---

[2] See Streng, *800 Tax Management: Estates, Gifts, and Trusts Portfolios: Estate Planning* (Washington, D.C., 1997), and Price, Contemporary Estate Planning (1992), § 1.32, pp 60-67, from which the tax information in this opinion was derived.

property left to a surviving spouse. The amount
deducted is not taxed upon the death of the first
spouse, but any assets remaining upon the death of
the second spouse are subject to taxation at that
time. Thus, if the decedent in the instant case had left
his estate entirely to his wife, no taxes would have
been due upon his death.

However, simply leaving all of one's assets to a sur-
viving spouse may pose problems apart from estate
taxation issues. Additionally, it may result in the
wasting of the first spouse's allowable unified credit.
In order to take advantage of both the first spouse's
unified credit and the unlimited marital deduction, a
revocable trust may be created. Upon the grantor's
death, the trust splits the decedent's assets into two
separate trusts or funds, e.g., a "family trust" that
would contain only the assets necessary to reach the
applicable exclusion amount and a "marital trust"
containing the remainder. In this so-called "normal"
scenario, no taxes are due upon the death of the first
spouse and, although the assets left to the surviving
spouse are subject to taxes upon the latter's death,
the family trust can generate interest income to the
surviving spouse or can grow tax free and be distrib-
uted to the remaining beneficiaries upon the latter's
death.

Alternatively, as referenced in Price, Contemporary
Estate Planning (1992), § 2.9.2, p 112, "[b]ecause of
the progressive nature of the federal transfer tax, the
overall gift and estate tax burden may be minimized if
the sizes of the spouses' estates are equalized." The
estate tax, like the income tax, is based on a sliding
scale with the top tax percentage greater than the
bottom. So, it may be to the advantage of a couple
with larger estates whose assets are disparate to pay

some of the tax upon the death of the first spouse rather than having to pay a larger total tax when the second spouse dies.

These two strategies are obviously incompatible, with the so-called "normal" estate plan relying on the time value of money and the reluctance of some wealthier individuals to pay taxes, while the "equalization" strategy takes advantage of the sliding rate schedule. In the "normal" trust, the family trust receives only the amount necessary to reach the applicable exclusion amount, while in a trust containing an "equalization" clause, the money is split equally between the two trusts. The issue in the instant case basically involves the difference between the two, with plaintiffs arguing that while the decedent actually wanted a "normal" estate plan, the language of the trust documents created an "equalization" plan that caused the estate to be taxed upon the death of the decedent.[3]

A number of the underlying facts are undisputed in this case. The original trust of the decedent, Abraham Karam, Jr., was prepared in 1987 by attorney Raymond Lynch, who is now deceased. This trust named the decedent as trustee and defendant NBD and plaintiff David Karam as successor trustees in the event the decedent could no longer serve. Included in this trust was the provision at issue that contained language creating two separate trusts, the marital trust

---

[3] There are other considerations about which plan to choose, the greatest probably being which beneficiary gets control of the money. Because the surviving spouse's access to the family trust is normally more limited than her access to the marital trust, she has an interest in having most of the money enter the marital trust. In the instant case, because of a Qualified Terminable Interest Property (QTIP) provision in the marital trust, as amended, this consideration does not play quite the same role.

and the family trust. Upon the death of the decedent (if Carole Karam survived him), the trust provision required the trustees to use the "equalization" model to apportion the decedent's assets between the two trusts.

The decedent met with Arthur B. Hudson, vice president of NBD's trust division, sometime in 1993 to discuss his estate plan. At that time, Hudson provided advice about the trust document. Hudson allegedly then sent the decedent a letter disclosing his views and recommending that the decedent contact an attorney to address Hudson's concerns. Although the parties dispute the nature of that discussion, the letter Hudson purportedly wrote contains a discussion indicating that the existing trust's distribution scheme was a "normal" one, with the first $600,000 passing into the family trust and the remainder to the marital trust, contrary to the actual language of the trust instrument. Upon receiving the letter, the decedent contacted defendant Ralph J. Kliber, who, after analyzing the decedent's trust and the letter, drafted the decedent's last will and testament and an amendment of the trust agreement. The decedent signed these documents on December 22, 1994. This first amendment changed the terms of the marital trust by adding a Qualified Terminable Interest Property (QTIP) provision pursuant to 26 USC 2056(b)(7),[4] but did not change the nature of the controversial "equalization"

---

[4] Although a thorough discussion of a QTIP provision is outside the realm of the question presented by plaintiffs, a QTIP provision acts as a variation of the so-called "normal" marital trust, which gives the surviving spouse absolute discretion to spend the money in the marital trust. See Contemporary Estate Planning, *supra*, §§ 5.23-5.23.11, pp 392-405. With a QTIP provision, the donor spouse can claim a marital deduction on the amount of money that goes into the trust (thus avoiding estate taxes on this amount on the death of the first spouse) while protecting the corpus

language. Defendants Kliber (apparently through Ralph Kliber) subsequently prepared two additional amendments of the trust; however, neither dealt with the controversial language. The last amendment simply removed NBD as a successor trustee, replacing it with Carole Karam. The decedent died in September 1997. As a result of the language of the trust, the decedent's assets were split almost evenly between the marital and family trusts, with a resulting federal estate tax of $1,676,494 and additional Michigan inheritance taxes in the amount of $417,115.

Plaintiffs later filed this action alleging malpractice by defendants Kliber, breach of fiduciary duty by NBD, negligence by NBD, and a violation of the Michigan Consumer Protection Act, MCL 445.901 *et seq.*, by defendant NBD. Following extensive discovery, defendants Kliber moved for summary disposition pursuant to MCR 2.116(C)(8) and (10), arguing, in essence, that our Supreme Court's decision in *Mieras v DeBona*, 452 Mich 278; 550 NW2d 202 (1996), rendered plaintiffs' extrinsic evidence inadmissible, and because plaintiffs were unable to show any inconsistencies in the estate documents themselves, plaintiffs were without standing to sue defendants Kliber for malpractice. Subsequently, defendant NBD also moved for summary disposition under MCR 2.116(C)(10), arguing that (1) plaintiffs could not use extrinsic evidence to establish that the decedent's intent was different from that expressed in the trust instruments, (2) defendant NBD did, in fact, advise the decedent that his trust instrument contained an "equalization" provi-

---

of the trust for future beneficiaries from the whims of the surviving spouse. See *id.* at 392-394.

sion, and (3) the statute of limitations barred plaintiffs' claims.

Plaintiffs challenged defendants Klibers' assertions on the grounds that (1) the bar against the use of extrinsic evidence in legal malpractice actions extends only to allegations of negligent drafting of a will, not allegations of negligent advice or misrepresentations to clients, (2) the decedent's intent regarding asset allocation was not clearly expressed in the trust documents, therefore, *Mieras* is inapplicable, (3) defendants should be estopped from claiming that the decedent's intent was different from that reflected in the letters from defendants, and (4) as a matter of public policy, the extrinsic evidence bar in *Mieras* should not be extended beyond the facts in that case. Responding to defendant NBD's motion, plaintiffs argued the same grounds raised in their earlier brief and additionally maintained (1) that they had presented a question of fact regarding defendant NBD's actual assertions (through Hudson) to the decedent, and (2) that the statute of limitations did not bar plaintiffs' claims.

Following a hearing, the trial court granted summary disposition to all defendants. In an extensive opinion, the trial court held that, absent an inconsistency within the trust documents themselves, *Mieras* barred plaintiffs from using extrinsic evidence to establish the decedent's intent and that, without reference to the extrinsic documents, plaintiffs were unable to maintain a claim of malpractice against defendants. The trial court did not reach plaintiffs' estoppel argument or defendant NBD's alternate grounds for dismissal. Thereafter, the trial court entered a final order dismissing plaintiffs' claims.

## II. ANALYSIS

Plaintiffs argue that the trial court erred in dismissing their claims against defendants. Specifically, plaintiffs claim that the trial court erred in applying *Mieras* to the facts of this case because *Mieras* dealt solely with a suit by the beneficiaries of a will, and this case involves a suit not only by a beneficiary but also by the personal representatives of an estate.[5] Plaintiffs argue that extrinsic evidence is admissible to determine both the existence of a misrepresentation and the resulting damages in cases of a breach of a fiduciary duty such as that of defendants to the estate (through the testator). We disagree and conclude that the extrinsic evidence plaintiffs seek to use as beneficiaries or personal representatives is inadmissible to show that the decedent's intent differed from that plainly expressed in the trust.

Although the trial court did not explicitly identify the specific subrule under which summary disposition was granted, it appears that summary disposition was granted pursuant to MCR 2.116(C)(8) because the court limited its review to the pleadings and determined that extrinsic evidence was not admissible to establish that the decedent's intent was other than that expressed in the trust documents.[6] Further, in granting summary disposition, the trial court relied on

---

[5] We note that plaintiffs argued below that *Mieras* should be limited to its facts, but it appears that they did not specifically argue that *Mieras* should not apply to cases where a personal representative, rather than a beneficiary, sues an attorney for malpractice regarding estate planning. Therefore, it is arguable that this specific issue has not been preserved. In any event, we address it.

[6] The various trust documents were attached as exhibits to plaintiffs' complaint and, therefore, are considered a part of the pleading for all purposes. MCR 2.113(F)(2).

*Mieras*, in which the Supreme Court analyzed the issue under MCR 2.116(C)(8). This Court generally reviews de novo a decision on a motion for summary disposition pursuant to MCR 2.116(C)(8). *Beaty v Hertzberg & Golden, PC*, 456 Mich 247, 253; 571 NW2d 716 (1997). The motion is tested on the pleadings alone and all factual allegations are accepted as true. *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995). Summary disposition is proper where the claim "is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.*

Generally, "[i]n an action for legal malpractice, a plaintiff must establish (1) the existence of an attorney-client relationship, (2) the acts that are alleged to constitute negligence, (3) that the negligence was a proximate cause of the injury, and (4) the fact and extent of the injury alleged." *Teodorescu v Bushnell, Gage, Reizen & Byington (On Remand)*, 201 Mich App 260, 264; 506 NW2d 275 (1993). In the instant case, it appears that the fact that there was no direct attorney-client relationship between the plaintiffs and defendants Kliber was the underlying rationale for the dismissal of the suit.

### A. THE APPARENT SCOPE OF *MIERAS* AND THIS COURT'S SUBSEQUENT OPINION IN *BULLIS v DOWNES*

In dismissing plaintiffs' claims, the trial court relied almost exclusively on *Mieras*, in which our Supreme Court considered the issue whether a number of beneficiaries to a will could maintain an action against the drafting attorney for malpractice. In *Mieras*, the testator, Nita Ledbetter Jackson, executed a new will disinheriting her daughter Juanita Neville and dividing

her estate between her other children, Ruth Ann Mieras and Elmer E. Ledbetter, the plaintiffs in the case. *Mieras, supra* at 281. However, the testator had been given a power of appointment in a previous trust and the new will did not contain a clause exercising that power. Thus, Neville took a third of the money contained in that trust, irrespective of the language in the will disinheriting her. *Id.* The plaintiffs sued the drafting attorney for malpractice, seeking damages equivalent to Neville's one-third share of the assets and also for emotional distress as a result of the attorney's alleged negligence in failing to include in the will the provision exercising the power of appointment. *Id.* at 281-282. Although the trial court granted the defendant's motion for summary disposition, this Court reversed,[7] noting the trend toward allowing beneficiaries to sue attorneys under negligence, third-party beneficiary contract, or hybrid theories. *Id.* at 282. Although the Supreme Court partially agreed with this Court and recognized a limited right to sue, it reversed this Court's decision and affirmed the trial court's grant of summary disposition because of the limitations on such causes of action.

In *Mieras*, Justice LEVIN wrote the lead opinion, and Justice BOYLE wrote a partially concurring opinion, which was joined by the other five justices. Both opinions agreed that beneficiaries named in a will should be afforded some right to sue the drafting attorney for malpractice. Although an attorney usually owes a duty solely to his client, in situations involving a will, the actual parties in interest, the estate and the personal representative, do not ordinarily have an interest in who obtains the money to be distributed

---

[7] 204 Mich App 703; 516 NW2d 154 (1994).

under the will. Hence, they would have little to gain by suing the attorney because the attorney's negligence does not harm the estate except to the extent of the fees paid for the will. *Id.* at 290 (LEVIN, J.), 297 (BOYLE, J.).

However, the two opinions then differed on the circumstances under which a beneficiary named in a will could maintain a cause of action against the drafting attorney. In her majority opinion, Justice BOYLE stated: "The duty owed to named beneficiaries is narrowly circumscribed and only requires the attorney to draft a will that properly effectuates the distribution scheme set forth by the testator in the will." *Id.* at 302 (BOYLE, J.).

Quoting Justice LEVIN's opinion, Justice BOYLE, *id.* at 303, explained the rationale behind this limitation:

> The lead opinion properly acknowledges that a disappointed beneficiary should not be allowed to use extrinsic evidence to prove that the testator's intent is other than that set forth in the will.
>
> "There is no authority—the reasons being obvious—for the proposition that a disappointed beneficiary may prove, by evidence totally extrinsic to the will, the testator's testamentary intent was other than as expressed in his solemn and properly executed will." [*Ante* at 292, quoting *DeMaris v Asti*, 426 So 2d 1153, 1154 (Fla App, 1983).]

Again adopting Justice LEVIN's reasoning (see *Mieras, supra* at 292, n 26 [LEVIN, J.]), Justice BOYLE further observed the "obvious" reasons for the disallowance of this evidence:

> "If extrinsic evidence is admitted to explain testamentary intent, as recommended by the petitioners, the risk of misinterpreting the testator's intent increases dramatically. Furthermore, admitting extrinsic evidence heightens the ten-

dency to manufacture false evidence that cannot be rebutted due to the unavailability of the testator. For these reasons, we adhere to the rule that standing in legal malpractice actions is limited to those who can show that the testator's intent *as expressed in the will* is frustrated by the negligence of the testator's attorney." [*Id.* at 304-305 (BOYLE, J.), quoting *Espinosa v Sparber*, 612 So 2d 1378, 1380 (Fla, 1993) (emphasis in original).]

Applying this rationale to the facts in *Mieras* itself, the majority held:

> We hold that beneficiaries named in a will may bring a tort-based cause of action against the attorney who drafted the will for negligent breach of the standard of care owed to the beneficiary by nature of the beneficiary's third-party beneficiary status. Because the will in this case fulfills the intent of the testator as expressed in that document, we reverse the opinion of the Court of Appeals. [*Mieras, supra* at 308 (BOYLE, J.).]

Following the decision in *Mieras*, this Court in *Bullis v Downes*, 240 Mich App 462; 612 NW2d 435 (2000), extended its holding to other estate planning documents, including a testamentary trust such as the one in the instant case. The Court held that "[g]iven the realities of modern estate planning, with the proliferating use of alternative methods of estate disposition, we see no reason to deny third-party standing to those beneficiaries identified in these alternative instruments." *Id.* at 468. Noting, however, that the limitation set forth in *Mieras* still applied, the *Bullis* Court limited the standing of third-party trust beneficiaries in a similar manner:

> When the estate plan at issue involves more than one instrument, the *Mieras* prohibition on the use of extrinsic evidence means that standing is limited to those third-party

beneficiaries who can establish that the decedent's intent as expressed in the overall estate plan has been frustrated by the attorney who drew up that plan. [*Id.* at 469.]

However, the *Bullis* Court itself specifically relied on the extrinsic evidence of the defendant attorney's admission to determine what documents were, in fact, part of the estate plan, stating: "Defendant himself testified that the deed was a part of the decedent's overall estate plan. We see no good reason to turn a blind eye to defendant's own sworn admissions regarding the purpose of the deed." *Id.* at 470. Moreover, the *Bullis* Court also appears to have found it properly within the scope of *Mieras* to use the "extrinsic" testimony of the drafting attorney to determine the decedent's intent, noting:

During the hearing regarding on [sic] the brothers' petition, defendant testified that it was always the decedent's intent that plaintiff receive the Lyons and Kalkaska properties. He stated that the two parcels were deeded to the trust in order "to avoid . . . the Probate Court getting involved and so that it would pass through the trust, rather than creating a joint tenancy, or gifting during her lifetime." Defendant also testified that when he drafted the trust, he believed that the two parcels could be conveyed to plaintiff pursuant to the following provision:

"The Trustee is authorized, but not required, to pay directly or to the Settlor's estate from the principal of the trust estate, such amounts as may be needed to pay all or any part of Settlor's funeral and cremation expenses, debts and legally enforceable claims against the Settlor or Settlor's estate, reasonable expenses of administration of Settlor's estate, gifts provided for in Settlor's Last Will and Testament, and any allowances by court order for those dependent upon Settlor."

When asked by plaintiff why he did not specify in the trust that the decedent's real property should be distributed

according to the terms of the will, defendant responded, "I—hindsight, I guess, is always twenty/twenty. The provisions of the will were clear. . . . Also there's [sic] other references within the trust agreement to the fact that the provisions of the will are to be adhered to first." [*Id.* at 465-466.]

Thus, although purporting to hold to the constraint in *Mieras* regarding the prohibition of extrinsic evidence, this Court apparently recognized at least a partial exception applicable when the evidence is the testimony of the drafting attorney *and* it is used to determine either the decedent's intent when that intent is not clear from the documents or what the estate plan actually comprises.

We glean from our reading of both *Mieras* and *Bullis* that, at least in terms of an action by the beneficiaries, the beneficiaries may not introduce extrinsic evidence to show that the decedent intended an outcome different from that clearly set forth by the language of the estate documents, whether couched in terms of the lack of standing to sue or the inadmissibility of proposed evidence. Where the decedent's intent is clearly expressed and the documents effectuate that intent, the beneficiaries are constrained to live with the result and the drafting attorney is not liable. However, where, as in *Bullis*, the estate plan documents contain internal inconsistencies, extrinsic evidence may be introduced to determine the testator's intent and what documents actually comprise the estate plan itself. We note that such a distinction is in keeping with the previous and subsequent law from this Court that

[t]he role of the probate court is to ascertain and give effect to the intent of the testator as derived from the language of

the will. *In re Woodworth Trust*, 196 Mich App 326, 327; 492 NW2d 818 (1992). Absent an ambiguity, the court is to glean the testator's intent from the four corners of the testamentary instrument. *Id.* An ambiguity may be patent or latent. *Id.* at 327-328. A latent ambiguity may be proved by facts extrinsic to the testamentary instrument. See *id.* at 328. [*In re McPeak Estate*, 210 Mich App 410, 412; 534 NW2d 140 (1995).]

See, also, *In re Webb H Coe Marital & Residuary Trusts*, 233 Mich App 525, 528, n 1; 593 NW2d 190 (1999).

### B. THE APPLICATION OF THE ABOVE CASE LAW TO BENEFICIARY PLAINTIFF CAROLE KARAM.

Applying the above case law, plaintiff Carole Karam in her role as a third-party beneficiary does not have "standing" to sue defendants under the circumstances of this case.[8] We disagree with plaintiffs' claim that the decedent's intent as expressed in the trust was not clear.[9] The language in § 2.2 of the decedent's trust clearly contemplates an "equalization" tax scheme as indicated by the following highlighted language:

> The Trustees shall allocate to the Marital Trust a sum which, when taken together with the value, for federal estate tax purposes, of all items in the Settlor's gross estate which qualify for the federal estate tax marital deduction and which pass or have passed, in a form which qualifies for the federal estate tax marital deduction, from the Settlor

---

[8] As did the trial court, for this part of the analysis, we assume that a third-party beneficiary may bring the malpractice suit against defendant NBD.

[9] Although it did not explicitly state so in its opinion, the trial court's language indicates that it found the estate documents internally consistent.

to Settlor's spouse under the provisions of the Settlor's will or otherwise will obtain for the Settlor's estate a marital deduction *which will result in the lowest combined federal estate tax applicable to the Settlor's estate and the Settlor's spouse's estate,* on the assumption that Settlor's spouse shall die after Settlor, but on the date of Settlor's death, and that the Settlor's spouse's estate is valued as of that date on and in the manner in which Settlor's estate is valued for federal estate tax purposes. *It is the intention of the Settlor to equalize both spouse's estates for federal estate tax purposes, based upon such assumption.* [Emphasis added.]

Plaintiffs' arguments that this language is internally inconsistent and therefore ambiguous are based on two theories, both relying on the fact that the defendants, allegedly knowing that the decedent wanted a "normal" distribution scheme, failed to inform the decedent that the trust did not provide for this type of a scheme. However, arguing that the trust document was not clear because defendants negligently failed to read it or failed to properly read it constitutes circular reasoning. Indeed, as defendants Kliber note, plaintiffs admit that the trust language created an equalization model for distribution because they sought reformation of other provisions of the trust in the probate court. The language, while perhaps not easily understood by those unfamiliar with tax law, unequivocally establishes a specific planning scheme.[10] Therefore, after reviewing the previous

---

[10] One of the shortcomings of the *Mieras* decision is that it does not adequately cover situations where, as in the instant case, the estate document specifically requires a reference to extrinsic evidence, such as the tax tables, to determine or clarify intent. The trust in the instant case, as these types of documents usually do, requires reference to federal law and tax schedules to determine the actual amount to be placed into each trust. Thus, it would seem to be impossible for a beneficiary to have standing under *Mieras* in situations where complicated estate planning documents are involved because this beneficiary would never be able to show, with-

case law and finding the contested language "clear" in terms of the stated intent, we conclude that, as a beneficiary, plaintiff Carole Karam has no standing to bring a malpractice claim against defendants, notwithstanding that the testator's intent expressed in the trust may not have been the decedent's true intent. Because the decedent's intent *as expressed in the trust* is not ambiguous, the trial court did not err in granting summary disposition in favor of defendants with respect to Carole Karam's claim as an individual beneficiary.

### C. THE APPLICATION OF THE ABOVE CASE LAW TO THE PERSONAL REPRESENTATIVE PLAINTIFFS.

Although *Mieras* and *Bullis* preclude Carole Karam as an individual beneficiary from introducing extrinsic evidence to support her claim alleging malpractice, these cases do not directly prevent plaintiffs as personal representatives from utilizing extrinsic evidence. Plaintiffs cite *Harts v Farmers Ins Exch*, 461 Mich 1; 597 NW2d 47 (1999), in support of their position that they should be allowed to introduce extrinsic evidence on behalf of the *estate* (or personal representatives). In *Harts*, the Supreme Court discussed the duties of an insurance agent toward an insured to provide advice about the scope of coverage. However we do not find *Harts* helpful in resolving the issue regarding personal representatives and the use of extrinsic evidence.

We conclude on the basis of *Mieras* and *Bullis* that personal representatives are also barred from relying

out reference to at least some extrinsic evidence, that the attorney frustrated the decedent's intent through poor drafting.

on extrinsic evidence to dispute a settlor's intent that is clearly expressed in the estate plan documents. *Mieras* clearly holds that extrinsic evidence may not be used to demonstrate a testator's intent different from that expressed in a will, and *Bullis* extended that holding to other estate planning documents. If extrinsic evidence were admitted to explain testamentary intent, the risk of misinterpreting that intent, and the potential to manufacture false evidence that cannot be rebutted because of the unavailability of the testator, would increase dramatically. *Mieras, supra* at 292, n 26 (LEVIN, J.), 304-305 (BOYLE, J.). As previously discussed, the decision in *Mieras* allowed beneficiaries to bring suit because the estate (or personal representative) would have no incentive to sue the drafter since the personal representative usually has no interest in the actual distribution of the assets or the persons who receive them. *Id.* at 290 (LEVIN, J.), 297 (BOYLE, J.). Specifically, the Supreme Court stated:

> First, if the named beneficiaries are to step into the shoes of the testator, and justification for the suit is to enforce a duty owed to the testator by the drafter, the beneficiaries would be allowed to recover only the damages the testator would be able to recover, presumably, the price paid for the will. . . . Second, the personal representative of the estate is the proper party to assert a cause of action for breach of a duty owed to the testator. But . . . *the personal representative has neither the legal capacity nor the incentive to assert a cause of action because the estate is not harmed in any way.*
>
> "After [the testator's] death, a failure in his testamentary scheme works no practical effect except to deprive his intended beneficiaries of the intended bequest. Indeed, *the executor of an estate has no standing to bring an action for the amount of the bequest against an attorney who neg-*

*ligently prepared the estate plan, since in the normal case
the estate is not injured by such negligence except to the
extent of the fees paid; only the beneficiaries suffer the real
loss."* [*Id.* at 297 (BOYLE, J.), quoting *Heyer v Flaig*, 70 Cal
2d 223, 228; 74 Cal Rptr 225; 449 P2d 161 (1969) (emphasis
added).]

Thus, although *Mieras* was decided with respect to
beneficiaries, *Mieras* also clearly provides strong and
persuasive guidance with respect to personal repre-
sentatives. Because a personal representative stands
in the place of the decedent with respect to the dece-
dent's property, the personal representative is
"responsible for the management and distribution of
the estate's assets." *Michigan Nat'l Bank & Trust Co
v Morren*, 194 Mich App 407, 411; 487 NW2d 784
(1992). In this case, because the beneficiaries, not the
estate, suffered the real loss, the personal representa-
tives have no standing to assert a cause of action.
Moreover, even were we to conclude that a personal
representative does have standing, *Mieras* and *Bullis*
limit the use of extrinsic evidence to demonstrate a
testator's intent. As stated in *Mieras*, " 'standing in
legal malpractice actions is limited to those who can
show that the testator's intent *as expressed in the
will* is frustrated by the negligence of the testator's
attorney.' " *Mieras, supra* at 305, quoting with
approval *Espinosa, supra* at 1380 (emphasis in origi-
nal). In the instant matter, the trust fulfills the intent
of the settlor as expressed in that document. Further,
because the estate plan documents do not contain
internal inconsistencies and there is no dispute
regarding what documents comprise the estate plan,
extrinsic evidence is not allowable under *Bullis*.

III. CONCLUSION

The trial court did not err in finding that plaintiffs, as beneficiaries and personal representatives, lacked standing to sue defendants[11] because they could not show without reference to extrinsic evidence that the documents as written did not conform to the decedent's intent as clearly stated in the documents.[12]

We affirm.

---

[11] As stated by the trial court, although plaintiffs' claims against NBD do not sound in legal malpractice, plaintiffs fail to present any persuasive rationale for a legal distinction of *Mieras*. We will not allow the anomalous result of excluding extrinsic evidence of the settlor's intent in an action against the draftsman-lawyer and admit such evidence in an action against the financial advisor.

[12] Plaintiffs also argue that defendants should be equitably estopped from claiming that the decedent's intent was different from defendants' representations of what the trust provisions meant. The trial court did not address this issue. "Appellate review is generally limited to issues decided by the trial court." *Candelaria v B C Gen Contractors, Inc*, 236 Mich App 67, 83; 600 NW2d 348 (1999). In any event, we conclude that plaintiffs' equitable estoppel argument rests on the use of prohibited extrinsic evidence so it cannot form the basis of relief.