# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

*In re* MARDIGIAN ESTATE

Docket No. 152655. Argued December 6, 2017 (Calendar No. 1). Decided June 21, 2018.

Attorney Mark S. Papazian submitted in the Charlevoix County Probate Court the will and trust he had drafted for the decedent, Robert D. Mardigian, who was an unrelated friend. Melissa Goldberg, Susan Lucken, and others contested the documents on the ground that Papazian had drafted them in violation of the Michigan Rules of Professional Conduct (MRPC) because they made Papazian and his children the recipients of the bulk of the decedent's estate in contravention of public policy and MRPC 1.8(c), which generally prohibits an attorney from preparing an instrument that gives the attorney or his or her close family a substantial gift. The court, Frederick R. Mulhauser, J., granted partial summary disposition in favor of the challengers, and Papazian appealed, arguing that Michigan did not recognize a per se bar on testamentary gifts to unrelated attorneys and that a breach of MRPC 1.8(c) supplied a basis only for invoking the attorney disciplinary process, not for automatically voiding a trust or will. The Court of Appeals, WILDER, P.J., and STEPHENS, J. (SERVITTO, J., dissenting), reversed, holding that, under *In re Powers Estate*, 375 Mich 150 (1965), the documents were not necessarily invalid, but Papazian was required to overcome a presumption of undue influence arising from the attorney-client relationship in order to enforce them. 312 Mich App 553 (2015). The challengers applied for leave to appeal in the Supreme Court, which ordered and heard oral argument on whether to grant the application or take other peremptory action. 499 Mich 973 (2016). After hearing oral argument, the Supreme Court granted the application for leave to appeal. 500 Mich 1030 (2017).

The judgment of the Court of Appeals was affirmed by equal division.

Chief Justice MARKMAN, joined by Justices ZAHRA and CLEMENT, writing for affirmance, stated that, under the applicable provisions of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, and the underlying principles of probate law, the rebuttable presumption of undue influence articulated in *Powers* should apply to these circumstances. A new per se rule that would prohibit an attorney from drafting an instrument that names himself or herself as a beneficiary would not only be contrary to the fundamental principles of probate law and longstanding precedents of this state, but would also run afoul of EPIC, whose underlying purposes and policies include the discernment and effectuation of the decedent's intentions in the distribution of his or her property and whose express provisions require the contestant to bear the

burden of establishing undue influence.  The adoption of MRPC 1.8(c) had no effect on this conclusion because a breach of this rule only triggers the invocation of the attorney disciplinary process; it does not breach EPIC.  Chief Justice MARKMAN would have affirmed the judgment of the Court of Appeals for these reasons.

Justice MCCORMACK, joined by Justices VIVIANO and BERNSTEIN, writing for reversal, would have overturned *Powers* to the extent that it held that courts should apply a mere presumption of undue influence to a will contest in which an attorney drafted a testamentary document that names himself or herself as a beneficiary and would instead have adopted a per se rule of undue influence that voids substantial testamentary gifts to attorney-drafters.  Justice MCCORMACK stated that a per se rule would reflect updates to the relevant ethics rules, probate law, and evidentiary presumptions and would ensure that a testator's intent is effectuated by eliminating the possibility that the testamentary instrument was the product of undue influence, noting that the contrary approach would leave clients vulnerable, reward unscrupulous attorneys, and encourage costly litigation.  Accordingly, Justice MCCORMACK would have reversed the Court of Appeals.

Affirmed by equal division.

Justice WILDER took no part in the decision of this case because he was on the Court of Appeals panel.

©2018 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

FILED  June 21, 2018

STATE OF MICHIGAN

SUPREME COURT

*In re* MARDIGIAN ESTATE.

MARK S. PAPAZIAN, Executor for the
Estate of ROBERT DOUGLAS
MARDIGIAN,

        Appellee,

v

MELISSA GOLDBERG, SUSAN V.
LUCKEN, NANCY VARBEDIAN,
EDWARD MARDIGIAN, GRANT
MARDIGIAN, and MATTHEW
MARDIGIAN,

        Appellants,

and

JP MORGAN CHASE BANK, NA,

        Appellee.

No. 152655

BEFORE THE ENTIRE BENCH (except WILDER, J.)

MARKMAN, C.J. (*for affirmance*).

At issue is whether the rebuttable presumption of undue influence is applicable when the decedent's attorney breaches Michigan Rule of Professional Conduct (MRPC) 1.8(c), which generally prohibits an attorney from preparing an instrument giving the attorney or his or her close family a substantial gift. Appellants argue that a breach of MRPC 1.8(c) automatically renders an instrument void, while the appellee attorney argues that, rather than an invalidation of the instrument, a rebuttable presumption of undue influence arises in these circumstances. After considering the applicable provisions of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, and the underlying principles of probate law, it becomes clear to us that a rebuttable presumption applies to these circumstances. And, as we will explain, creating a new per se rule as appellants advocate would not only be contrary to the fundamental principles of probate law and longstanding precedents of this state but would also run afoul of EPIC. Moreover, the adoption of MRPC 1.8(c) has no effect on this conclusion because a breach of this rule, like breaches of other professional conduct rules, only triggers the invocation of the attorney disciplinary process; it does not breach the statutory law of EPIC. For these reasons, we conclude the Court of Appeals correctly held that, in the instant circumstances, existing statutes and caselaw give rise only to a rebuttable presumption of undue influence.

## I. FACTS AND HISTORY

On August 13, 2010, the decedent, Robert Mardigian, executed an amended trust that was prepared by appellee Mark Papazian, and on June 8, 2011, the decedent

executed a will prepared by Papazian. The amended trust and will operated to leave the bulk of the decedent's estate to Papazian, who was a close friend of the decedent, and to Papazian's children. On January 12, 2012, the decedent died.

Following the decedent's death, Papazian filed an action in the probate court and sought to introduce the amended trust and will. Appellants, who consist of the decedent's brother, two nephews, two nieces, and girlfriend, challenged the introduction of these documents, moving for summary disposition and requesting that the probate court void all gifts to Papazian and his children as a matter of law. Specifically, they argued that the gifts were contrary to public policy under MRPC 1.8(c).[1] The probate court eventually granted summary disposition in favor of the appellants and declined to admit the amended trust and will, explaining that it was "disinclined to enforce" documents that were prepared contrary to the MRPC.

Papazian appealed, arguing that Michigan did not recognize a per se bar on testamentary gifts to unrelated attorneys and that a breach of MRPC 1.8(c) supplied a basis only for invoking the attorney disciplinary process, not for automatically voiding a trust or will. In a split decision, the Court of Appeals reversed the probate court's order granting summary disposition in favor of appellants. Relying on this Court's decision in *In re Powers Estate*, 375 Mich 150; 134 NW2d 148 (1965), the majority held that it was "required to remand for further proceedings, in which [Papazian] will be required to overcome the presumption of undue influence arising from the attorney-client

---

[1] MRPC 1.8(c) states, "A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee."

3

relationship in order for the devises left to him and his family to be enforced." *In re Mardigian Estate*, 312 Mich App 553, 559; 879 NW2d 313 (2015). Pointing to the fact that *Powers* had been decided before this Court adopted MRPC 1.8(c), Judge SERVITTO dissented and would have affirmed the probate court's ruling that the gifts to Papazian and his family were void as against public policy. *Id*. at 570 (SERVITTO, J., dissenting).

Thereafter, appellants sought leave to appeal in this Court. We ordered oral argument on whether to grant the application or take other action and directed the parties to address whether this Court should overrule *Powers*. *In re Mardigian Estate*, 499 Mich 973 (2016). Subsequently, we granted the application for leave to appeal and directed the parties to address whether the rebuttable presumption set forth in *Powers* sufficiently protected a decedent and what role this Court's later adoption of MRPC 1.8(c) should play in the consideration of the issue. *In re Mardigian Estate*, 500 Mich 1030 (2017).

## II. STANDARD OF REVIEW

A trial court's decision regarding a motion for summary disposition is reviewed de novo. *Haksluoto v Mt Clemens Regional Med Ctr*, 500 Mich 304, 309; 901 NW2d 577 (2017). In addition, the resolution of this case requires the interpretation of statutes, which we also review de novo. *Id*.

## III. ANALYSIS

For the reasons that follow, both the historical framework under which we have analyzed gifts to attorneys and the current statutory framework, which codified the historical framework, require us to uphold *Powers* and its rebuttable presumption of undue influence, notwithstanding the later adoption of MRPC 1.8(c).

4

## A. HISTORICAL FRAMEWORK

One of the underlying purposes and policies of EPIC is "[t]o discover and make effective a decedent's *intent* in distribution of the decedent's property," MCL 700.1201(b) (emphasis added), but this purpose long predates EPIC and is entrenched deeply within the history of this state's probate law. Discovering and giving effect to this intent has been viewed as the foundational standard of probate law for centuries. See, e.g., *In re Blodgett's Estate*, 197 Mich 455, 461; 163 NW 907 (1917) (citing seventeenth-century jurist Lord Coke for the proposition that a testator's intent constitutes " 'the polar star to guide judges in their determination' "). See also *id*. at 461, quoting 4 Kent, Commentaries on American Law (14th ed), p 534 (" 'The intention of the testator is the first and great object of inquiry; and to this object technical rules are, to a certain extent, made subservient.' "); *Palms v Palms*, 68 Mich 355, 378; 36 NW 419 (1888) (opinion by CHAMPLIN, J.) ("In construing wills, it is well settled that the intent of the testator must be ascertained and carried into effect so far as it legally can be done."); *In re Churchill's Estate*, 230 Mich 148, 155; 203 NW 118 (1925) ("In the construction of wills the cardinal canon, the guiding polar star, is that the intent of the testator must govern . . . .").

At the same time, however, " '[u]ndue influence' exercised upon one who executes a will may become the basis for finding the will invalid *if that influence took from the testator his right to freely exercise his discretion* in disposing of his property." *In re Sprenger's Estate*, 337 Mich 514, 521-522; 60 NW2d 436 (1953) (emphasis added).[2] This is because undue influence is "something which destroys the free agency

---

[2] Similarly, "[a] trust is void to the extent its creation was induced by fraud, duress, or undue influence." MCL 700.7406.

of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator." *In re Williams' Estate*, 185 Mich 97, 120; 151 NW 731 (1915) (quotation marks and citation omitted). The burden of establishing undue influence has historically reposed with the party asserting it. *In re Sprenger's Estate*, 337 Mich at 522 (stating that undue influence "must be proved by the person seeking to have the will declared invalid"). And as this Court has explained:

> To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient. [*In re Karmey Estate*, 468 Mich 68, 75; 658 NW2d 796 (2003) (quotation marks and citation omitted).]

Additionally, there are occasions in which a rebuttable presumption of undue influence can arise:

> The presumption of undue influence is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction. [*Id*. at 73 (quotation marks and citation omitted).]

This rebuttable presumption has been said to apply to cases in which "a patient makes a will in favor of his physician, a client in favor of his lawyer, or a sick person in favor of a priest or spiritual adviser, whether for his own personal advantage, or for the advantage of some interest of which he is a representative." *In re Hartlerode's Estate*, 183 Mich 51, 60; 148 NW 774 (1914). For well over a century, this rebuttable presumption has been

6

applied to circumstances in which an attorney drafts a will providing that attorney with a gift from a client. See, e.g., *In re Bromley's Estate*, 113 Mich 53, 54; 71 NW 523 (1897) ("[A] bequest in favor of an attorney who draws a will is a circumstance arousing suspicion, and raises a presumption more or less strong that undue influence has been exerted . . . .").

Most significantly, in *Powers*, this Court specifically discussed the rebuttable presumption of undue influence as it arises when an attorney drafts a will in his or her own favor. The will in *Powers* had been drafted by an attorney who was married to the decedent's close friend, and it left substantial portions of the decedent's estate to both the attorney and the close friend (i.e., the attorney's wife). *In re Powers' Estate*, 375 Mich at 155-157. *Powers* began by recognizing the inherent ethical misconduct of the attorney: "If any prizes were to be awarded for dismal professional judgment, the proponent here would be in a fair way to be signally recognized." *Id*. at 157.[3] However, *Powers*

---

[3] Although the MRPC was not in existence at the time of *Powers*, an attorney drafting a will who had undertaken to make a gift in his or her own favor was nonetheless well recognized as unethical decades before *Powers*. As the concurring justice in *Powers* explained:

> [T]his Court almost 60 years ago bluntly warned the profession against such conduct, in [*Abrey v Duffield*, 149 Mich 248, 259; 112 NW 936 (1907)]:
>
> > By statute, a bequest to a subscribing witness, necessary for proving the will, is declared absolutely void (CL 1897, § 9268), and this, though the subscribing witness may be and generally is ignorant of the contents of the will. Although there is no statute to invalidate a bequest to a scrivener, the reasons are, at least, as strong for such a statute as in the case of the subscribing witness. I believe it to be generally recognized by the profession as contrary to the

proceeded to explain that the conduct of the attorney was not what was at issue; rather, the issue was whether the will itself was valid. *Id.* In light of this understanding, the attorney-client relationship was only relevant insofar as it tainted the validity of the will:

> The issue of the relationship of the attorney and his client, and the attorney and his wife as beneficiaries, is an additional element in the broader concept of undue influence. Essentially it goes to degree of proof necessary to establish prima facie the opportunity for the exercise of undue influence and the ultimate consideration of that question by the trier of the facts . . . .
>
> * * *
>
> This will contest is on no different legal and factual basis than any other in our past jurisprudence and we caution court and counsel if the case is retried to *confine* the testimony to the issues:
>
> (1) The well-defined, well-recognized test of the testatrix' competency to execute the testamentary instrument . . . ;
>
> (2) The equally well-defined and well-recognized issue of the exercise of fraud or undue influence in the execution thereof, including any presumption created by the fact that proponent was deceased's attorney and the fact that he drew the instrument . . . . [*Id.* at 157-158, 179 (emphasis added).]

As *Powers* recognized, the focus of the will contest is to determine the decedent's intention and not to judge and discipline the attorney's conduct. *Id.* at 178 ("The forum in which to test unprofessional conduct of an attorney in this State is adequately supplied in the State Bar grievance procedure. The forum in which not to test it is a jury trial

---

> spirit of its code of ethics for a lawyer to draft a will making dispositions of property in his favor, and this Court has held that such dispositions are properly looked upon with suspicion.
>
> [*Powers*, 375 Mich at 181 (SOURIS, J., concurring).]

determining testamentary capacity and undue influence."). Thus, that an attorney drafted a will giving a gift in his or her own favor only affects the will contest insofar as that is relevant to the rebuttable presumption of undue influence and the determination by the fact-finder whether such influence had been exerted.

In addition, our longstanding caselaw indicates that even when the rebuttable presumption of undue influence arises, "the burden does not rest upon the [proponent of the will] to show that the transaction was free from undue influence." *Hill v Hairston*, 299 Mich 672, 679; 1 NW2d 34 (1941). That is, the presumption historically did not shift the ultimate burden of proof to show undue influence. *In re Bailey's Estate*, 186 Mich 677, 692, 694; 153 NW 39 (1915) ("It is true that a presumption is raised that calls for an explanation, but the burden of proof to show undue influence is not thereby shifted. . . . [T]he burden of proof to show undue influence rest[s] upon the contestant, and not the proponent. Such, we think, is the settled law in this State."). See also *In re Jennings' Estate*, 335 Mich 241, 244; 55 NW2d 812 (1952) (stating that "there is no shifting of the burden of proof under the presumption" and "while it establishes a prima facie case in the absence of testimony on the subject, [the presumption itself] has no weight as evidence, is rebuttable, and cannot be weighed against evidence").[4]

---

[4] As this Court explained in *Widmayer v Leonard*, 422 Mich 280, 289; 373 NW2d 538 (1985), although a presumption itself should not be weighed as evidence, the inferences drawn from the facts creating the presumption may be weighed as evidence:

> [T]he function of a presumption is solely to place the burden of producing evidence on the opposing party. It is a procedural device which allows a person relying on the presumption to avoid a directed verdict, and it permits that person a directed verdict if the opposing party fails to introduce evidence rebutting the presumption.

9

In summary, even when a rebuttable presumption of undue influence has arisen, this Court has held that it does not shift the ultimate burden of proof; rather, that burden always remains with the contestant. This historical framework remains in place today but has now been incorporated through statute rather than existing exclusively in caselaw.

## B. EPIC FRAMEWORK

In 1998, the Michigan Legislature enacted EPIC, which became effective April 1, 2000. 1998 PA 386. As part of EPIC, the Legislature codified the applicable burdens of proof in will disputes in MCL 700.3407(1), which provides in pertinent part:

> All of the following apply in a contested case:
>
> * * *
>
> (c) A contestant of a will has the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation.
>
> (d) A party has the ultimate burden of persuasion as to a matter with respect to which the party has the initial burden of proof.[5]

---

Almost all presumptions are made up of permissible inferences. Thus, while the presumption may be overcome by evidence introduced, the inference itself remains and may provide evidence sufficient to persuade the trier of fact even though the rebutting evidence is introduced. But always it is the inference and not the presumption that must be weighed against the rebutting evidence.

[5] The term "burden of proof" encompasses two distinct concepts: (1) the burden "of producing evidence, satisfactory to the judge, of a particular fact in issue"; and (2) "the burden of persuading the trier of fact that the alleged fact is true." 2 McCormick, Evidence (7th ed), § 336, p 644. The latter burden, which can be referred to as "the risk of nonpersuasion," has been described as follows: "It marks . . . [t]he peculiar duty of him who has the risk of any given proposition on which parties are at issue,—who will lose the case if he does not make this proposition out, when all has been said and done." *Id*. at 644 n 4 (quotation marks and citation omitted; alterations in McCormick).

10

As MCL 700.3407(1) shows, the *contestant* bears the burden of establishing undue influence and this burden of persuasion remains throughout with the contestant. Notably, there are no exceptions in this regard. Accordingly, even where a *rebuttable* presumption of undue influence has arisen, EPIC still requires that the *contestant* establish undue influence and that the ultimate burden of persuasion remain with the contestant.[6] These requirements of EPIC are consistent with the historical framework discussed earlier, and the enactment of MCL 700.3407(1) remains in this regard a codification of existing law.[7]

---

[6] Although there is no specific EPIC provision that sets forth the applicable burden of proof for trust contests, the burden of establishing fraud or undue influence reposes in the party who asserts it even outside the context of wills, see *Hill*, 299 Mich at 678-680 (holding that in a challenge to an *inter vivos* gift, the burden lies with the contestant to show undue influence and that the rebuttable presumption of undue influence does not shift that burden), and the rules of evidence further provide a framework that is consistent with how MCL 700.3407(1) treats presumptions and the ultimate burden of persuasion for wills:

> In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. [MRE 301.]

Accordingly, under MRE 301, we believe that the same framework employed for wills is also appropriate in trust disputes. We are aware of no policy that would counsel any different standard.

[7] In addition to the fact that MCL 700.3407(1) plainly evidences the codification of existing law, commenters have concurred in this proposition:

> Under former Michigan Law, burdens of proof were addressed by case law. This statutory statement is intended to restate existing law without change. This provision [i.e., MCL 700.3407(1)] indicates that the presumption of undue influence (which often arises in cases in which there was a confidential relationship between the decedent and another who benefits from the will) does not change the ultimate burden of persuasion; it

11

Because EPIC and our rules of evidence each require that a will or trust contestant establish undue influence and that the ultimate burden of persuasion remains with the contestant despite any presumption that may arise, we see no basis to revisit the merits of *Powers*. Indeed, it may largely be immaterial whether *Powers* was correctly decided-- although we believe that it was-- because the Legislature itself subsequently adopted the same historical framework in its enactment of EPIC, which we are bound to follow.

## C. PER SE APPROACH

Appellants now ask us to disregard this historical framework and adopt a per se rule of undue influence under which a testamentary gift to a drafting attorney is automatically void when there has been a breach of MRPC 1.8(c). However, we believe that such an approach is inappropriate for several reasons.

First, a per se approach would wholly ignore any genuine consideration of the decedent's *intentions*, which as noted would violate both a foundational principle of probate law in general and one of EPIC's expressly stated policies. See *In re Kremlick Estate*, 417 Mich 237, 240; 331 NW2d 228 (1983) ("A fundamental precept which governs the judicial review of wills is that the intent of the testator is to be carried out as nearly as possible."); *In re Churchill's Estate*, 230 Mich at 155 ("In the construction of

only shifts the burden of going forward with the evidence. [Martin, *Estates and Protected Individuals Code with Reporters' Commentary* (ICLE, 2001), at 177.]

The opinion in support of reversal asserts that the instant citation constitutes a "novel use of legislative history." However, we do not rely on the above to *confer* meaning upon EPIC; it is merely cited as consistent with what we have argued the text *already* shows.

12

wills the cardinal canon, the guiding polar star, is that the intent of the testator must govern . . . ."); MCL 700.1201(b) (one of the underlying purposes of EPIC is "[t]o discover and make effective a decedent's intent in distribution of the decedent's property"); MCL 700.8201(2)(c) (one of the underlying purposes and policies of the Michigan Trust Code (MTC), which is set forth as Article VII of EPIC, is "[t]o foster certainty in the law so that settlors of trusts will have confidence that their instructions will be carried out as expressed in the terms of the trust"). Under a per se rule of undue influence, any attempt to discern the genuine and bona fide intention of the testator is subordinated at an early juncture to consideration of the attorney's conduct. And thus the "guiding polar star" that is the decedent's intention comes to be diminished in favor of an assessment of the behavior of his or her legal representative.[8]

Second, the per se approach is contrary to both MCL 700.3407(1)(c) and MCL 700.3407(1)(d), which respectively provide that a will contestant bears the burden of establishing undue influence and that the ultimate burden of persuasion remains with the party who had the initial burden of proof, i.e., the contestant. A per se rule of undue influence would altogether nullify these requirements by relieving the contestant of the burden to establish undue influence in circumstances in which the gift has been made to

---

[8] The opinion in support of reversal states, "Because I agree with the affirming opinion that *protecting testator intent* is our goal, I would adopt a per se rule of undue influence for attorney-drafters." (Emphasis added). Respectfully, we simply do not understand what this means. A per se rule effectively and completely forecloses any opportunity for a fact-finder to discover the testator's genuine intentions.

an attorney. For this same reason, the per se approach in the context of a trust challenge would improperly shift the burden of persuasion, contrary to MRE 301.

The opinion in support of reversal asserts that a per se rule of undue influence would not abrogate the contestant's burden to show undue influence because "[t]he contestant would have to show that the attorney violated MRPC 1.8(c), which requires showing (1) the attorney drafted the provision leaving himself a gift, (2) the gift was 'substantial,' and (3) the attorney and client were not related." We disagree. Such a showing does not establish undue influence in any meaningful sense; rather, it merely shows that there has been a breach of MRPC 1.8(c). As noted earlier, the precise nature of the "undue influence" necessary to invalidate a will is "something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator." *In re Williams' Estate*, 185 Mich at 120 (quotation marks and citation omitted). See also *In re Sprenger's Estate*, 337 Mich at 521-522 (" 'Undue influence' exercised upon one who executes a will may become the basis for finding the will invalid if that influence took from the testator his right to freely exercise his discretion in disposing of his property.") Whether there has been a breach of MRPC 1.8(c) does not address whether the decedent's free agency has been destroyed; it addresses only and obviously whether there has been a breach of MRPC 1.8(c).

Third, the issue whether a per se rule of undue influence is appropriate simply boils down, in our judgment, to enacting substantive public policy, which is the responsibility of the Legislature, not this Court. The opinion in support of reversal maintains that the instant opinion "leaves clients vulnerable, rewards unscrupulous

14

attorneys, [and] encourages costly litigation"; however, we believe that the instant opinion best accords both with the *law* and with longstanding practice under that *law*, in particular, with its dominant focus on ascertaining the genuine intentions of the testator.[9] In place of that focus, the opinion in support of reversal would introduce an irrebuttable legal presumption under which such intentions would simply be of no consequence in cases in which the presumption applied.

Whether the current probate framework is sufficient to protect a decedent requires difficult policy determinations that involve balancing the decedent's intentions with policies sanctioning unethical attorney conduct. And as this Court has explained:

> As a general rule, making social policy is a job for the Legislature, not the courts. This is especially true when the determination or resolution

---

[9] The opinion in support of reversal responds that the instant opinion "seems to presume that [the decedent's intent] is easily knowable. But that's exactly the problem. It's not." What we have said specifically, and what we now add in response, is as follows: (a) the decedent presumably knew his *own* intent and had every reason to assume that *that* intent would matter in probate; it does not to the other opinion; (b) of course, it is true that neither this Court, nor likely anyone else, knows the decedent's intent with the clarity and certainty with which the *decedent himself* knew that intent; (c) nonetheless, our legal system *does* presume that such intent is "knowable"; it is presumably made "knowable" by what is characterized as "evidence," in particular, evidence concerning the language of the will and evidence of relevant surrounding circumstances; (d) if, as the other opinion asserts, the "exact" problem is that the decedent's intent is not "knowable," then it is difficult to understand what fundamental premises inform the probate process in this case; (e) ascertaining the decedent's intent here should proceed as it does in all other cases in which there are questions concerning the decedent's intent and by the same standards; there are often complications when it becomes necessary to look beyond the four corners of a will to discern intent, but courts nonetheless undertake in these circumstances, to the best of their ability, to discern intent; and (f) however difficult or imperfect the probate process may sometimes be-- no one has suggested that it involves an "easy" determination in this case-- the instant opinion has as its *standard* of inquiry the discernment of Robert Mardigian's intent and the other opinion does not.

> requires placing a premium on one societal interest at the expense of another: The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's. [*Terrien v Zwit*, 467 Mich 56, 67; 648 NW2d 602 (2002) (quotation marks and citation omitted).]

If the current policy framework is insufficient to protect a decedent when MRPC 1.8(c) has been breached, and any further inquiry into the decedent's intentions should be compromised or foreclosed, it is the Legislature that ought to make this determination and provide for an appropriate limiting rule. See, e.g., *Agee v Brown*, 73 So 3d 882, 886 (Fla App, 2011) ("The best way to protect the public from unethical attorneys in the drafting of wills . . . is entirely within the province of the Florida Legislature."); *Sandford v Metcalfe*, 110 Conn App 162, 169-170; 954 A2d 188 (2008) ("[I]t is ill-advised, as a matter of public policy, for an attorney to draft a will in which she is to receive a bequest"; "[t]here is, however, no statute barring an attorney who drafted a testamentary instrument from inheriting by the instrument she drafted"; and "[i]f the law is to be changed to make provision for the situation at hand, it is for the legislature to make the change, not the court.").

Fourth, in specific circumstances in which the Legislature has deemed a disposition inappropriate *without regard* to the decedent's intent, it has invariably provided for an explicit rule that revokes the ordinary disposition. For example, MCL 700.2803(2)(a)(*i*) provides, "The felonious and intentional killing or the conviction of the felon for the abuse, neglect, or exploitation of the decedent . . . [r]evokes . . . [a] [d]isposition or appointment of property made by the decedent to the killer or felon in a governing instrument." See also MCL 700.2807(1)(a)(*i*) ("Except as provided by the

16

express terms of a governing instrument, court order, or contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce, or annulment, the divorce or annulment of a marriage . . . [r]evokes . . . [a] disposition or appointment of property made by a divorced individual to his or her former spouse in a governing instrument . . . .”). EPIC provides no such rule for circumstances in which an attorney has drafted a will or trust in his or her own favor, and it would be improper for this Court to adopt such a substantive rule on its own initiative. *Paselli v Utley*, 286 Mich 638, 643; 282 NW 849 (1938) (“This court cannot write into the statutes provisions that the legislature has not seen fit to enact.”).

For these reasons, we conclude that a per se rule of undue influence is untenable and incompatible with the longstanding policies of this state, and it would be inappropriate for this Court sua sponte to adopt such a rule.

## D. MRPC 1.8

Despite the clear statutory requirements and fundamental concepts of probate law in Michigan, appellants contend that the later adoption of MRPC 1.8(c) favors the implementation of the per se rule. Once again, MRPC 1.8(c) states, “A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee.” There are several reasons why the adoption of this rule does not warrant a change in current law or the overruling of our longstanding precedents in regard to the present controversy.

17

First, MRPC 1.8(c) became effective in 1988, which antedated *Powers* but predated the Legislature's decision to codify the requirements in EPIC that a contestant establish undue influence and that the burden of persuasion remain always with the contestant. That is, our Legislature chose to codify the requirements in EPIC *despite* the fact that MRPC 1.8(c) already was in place and provided that "[a] lawyer shall not prepare an instrument giving the lawyer . . . any substantial gift from a client . . . ." Therefore, even if it could be explained how the MRPC could alter substantive law-- which it cannot for the reasons that follow-- the earlier adoption of MRPC 1.8(c) would have no effect on EPIC's later-adopted requirements.

Second, MRPC 1.8(c) does not create a basis for voiding a will or trust. Rather, MRPC 1.8(c) merely prohibits a lawyer from preparing "an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client . . . ." The rule is silent concerning what effect, if any, a breach of the rule has upon the will or trust. This silence is filled by the nonsilence of MRPC 1.0(b), which relevantly provides:

> *Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process.* The rules do not, however, give rise to a cause of action for enforcement of a rule or for damages caused by failure to comply with an obligation or prohibition imposed by a rule. In a civil or criminal action, the admissibility of the Rules of Professional Conduct is governed by the Michigan Rules of Evidence and other provisions of law. [Emphasis added.]

In addition to the text itself of MRPC 1.0(b), this provision includes a comment setting forth the fundamental scope of the MRPC, and this comment further asserts that a

18

breach of the MRPC merely constitutes a basis for "invoking the *disciplinary* process."

The comment states:

> [A] failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process. . . .
>
> As also indicated earlier in this comment, a violation of a rule does not give rise to a cause of action, nor does it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purposes of the rules can be subverted when they are invoked by opposing parties as procedural weapons. *The fact that a rule is a just basis . . . for sanctioning a lawyer under the administration of a disciplinary authority does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extradisciplinary consequences of violating such a duty.* [Emphasis added; comma omitted.]

Thus, as limned in the text of MRPC 1.0 and further explained in its accompanying comment, the remedy for a breach of MRPC 1.8(c) is the "disciplinary process." Breaches of the MRPC just do not give rise to causes of action, and private parties cannot seek to enforce a disciplinary rule. Because MRPC 1.8(c) specifically is silent as to the effect of its breach, and because a breach of the MRPC generally only supplies a basis for invoking the attorney disciplinary process, MRPC 1.8(c) does not bear on the validity of *Powers* or on the resolution of this case.

<u>Third</u>, our caselaw also supports this conclusion by holding that standards of professional conduct do not create or modify substantive law. In *People v Green*, 405 Mich 273, 282; 274 NW2d 448 (1979) (opinion by COLEMAN, C.J.), we considered

19

whether a breach of the Code of Professional Responsibility could compel a particular ruling on substantive law.[10] The prosecutor in *Green* had breached disciplinary rule (DR) 7-104(A)(1), which provided that " 'a lawyer shall not . . . [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party . . . .' " *Id*. at 282-283, quoting DR 7-104(A)(1). The prosecutor interviewed the defendant alone after he had waived his *Miranda*[11] rights and stated that he wished to speak with the prosecutor without his lawyer present. *Id*. at 287. The defendant then offered statements that were later used as incriminating evidence at his trial. *Id*. at 287-288. Defense counsel moved to suppress these statements in part on the ground that the prosecutor had breached DR 7-104(A)(1), but the trial court denied the motion. *Id*. On appeal, a majority of this Court held that, although the prosecutor had breached a rule of professional conduct stating that he "shall not" engage in such conduct, his breach did not afford a basis for suppression of the evidence obtained.[12] *Id*.

---

[10] The Code of Professional Responsibility preceded the adoption of the MRPC.

[11] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[12] Chief Justice COLEMAN authored the lead opinion with only Justice RYAN joining the opinion in full; however, a majority agreed with its reasoning that a breach of the code did not bear on the admissibility of evidence. The Chief Justice ultimately concluded that the exclusionary rule did not apply and rejected the notion that a breach of the code affected substantive law. Justice WILLIAMS, joined by Justice FITZGERALD, wrote separately, agreeing with the lead "opinion that the prophylactic exclusionary rule need not, and should not, be extended to cover this case." *Id*. at 296 (WILLIAMS, J., concurring in part and dissenting in part). They further agreed that a breach of the code did not compel the exclusion of the evidence. Justice WILLIAMS and Justice FITZGERALD noted that courts could refer attorneys to the bar for disciplinary action to deter wrongful conduct and thus dissented in part because they would have "order[ed] the Clerk to report

20

at 293-297. Instead, the lead opinion summarized the difference between the Code of Professional Responsibility and substantive law:

> [Defendant's] argument rests upon a basic misconception of the Code of Professional Responsibility. The provisions of the code are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar. Although it is true that the principal purpose of many provisions is the protection of the public, the remedy for a violation has traditionally been internal bar disciplinary action against the offending attorney. The sanctions available are by no means trivial. The attorney faces permanent disbarment. In these respects the provisions of the code are no different from the provisions found in the codes of conduct for other professions, such as medicine or architecture. They are all self-governing, in-house regulations.
>
> The admissibility of evidence in a court of law, on the other hand, is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions. [*Id*. at 293-294.]

Accordingly, under *Green*, a breach of a standard of professional conduct "standing alone should be dealt with by bar disciplinary action rather than" by allowing the breach to affect the substantive legal decisions of a case. *Id*. at 294.

For these reasons, a breach of the MRPC merely constitutes grounds for invoking the attorney disciplinary process. The rules of professional conduct promulgated by this Court should neither overrule nor give rise to substantive law. Therefore, the adoption of MRPC 1.8(c), which occurred before the Legislature enacted the current probate

---

the assistant prosecuting attorney's action in this matter to the grievance authorities for appropriate action." *Id*. at 297. As a result, a majority of the Court agreed that, although the prosecutor had breached a standard of professional conduct that prohibited him from engaging in certain conduct, the breach did not dictate the substantive law.

framework of this state under EPIC, has no effect on either governing law in this case or on the proper resolution of this matter. See *Green*, 405 Mich 273. See also, e.g., *In re Bloch*, 425 Pa Super 300, 310; 625 A2d 57 (1993) ("To the extent that the [attorney's] conduct is challenged as unethical behavior violative of the Rules of Professional Conduct, Rule 1.8(c), our Supreme Court has held that enforcement of the Rules of Professional Conduct does not extend itself to allow courts to alter substantive law or to punish an attorney's misconduct.").

## IV. REMAINING ISSUES

Independent of the undue-influence analysis, appellants argue that the will and the trust here should be held automatically void because their "purposes" ran contrary to "public policy." MCL 700.7404 provides that "[a] trust may be created only to the extent its purposes are lawful, not contrary to public policy, and possible to achieve." Furthermore, MCL 700.7410(1) provides that "a trust terminates to the extent . . . the purposes of the trust . . . are found by a court to be unlawful or contrary to public policy." EPIC does not contain any similar provision for wills. However, even if EPIC contained such a provision, appellants' overall argument fails because (a) it ignores the distinction between the *purpose* of a will or trust and the *manner* in which these are formed and (b) automatically invalidating a will or trust for a breach of MRPC 1.8(c) continues to give insufficient regard to the critical countervailing policy consideration: discerning and giving faithful effect to the decedent's intentions. Here, the "purposes" of the will and the trust were to bestow a gift to a friend, which in no way is at odds with public policy. Appellants fail to cite any genuine public policy that runs contrary to the purposes of *this*

22

will and *this* trust, but instead merely take issue with the *manner* in which these instruments were formed, and thus their public policy arguments are flawed.[13]

Additionally, appellants argue that MRPC 1.8(c) sets forth an "indicator" of public policy-- see *Terrien*, 467 Mich at 67 n 11 ("We note that, besides constitutions, statutes, and the common law, . . . rules of professional conduct may also constitute definitive indicators of public policy.")-- and therefore that a breach of MRPC 1.8(c) renders a will and trust void on public policy grounds. At the same time, appellants fail even to

---

[13] Although the opinion in support of reversal asserts that "there is no need to resort to public policy because our Court has long had the power to establish the law of fraud," it analogizes the instant case to those in which courts have found unethical fee-splitting contracts between attorneys to be unenforceable on the basis of "public policy." Such an analogy fails to fully appreciate the distinction between contracts and wills and trusts. As the Court of Appeals usefully explained:

> In the case of a contract deemed void as against public policy because it violates the MRPC, it is principally the drafting lawyer who suffers the consequence of the invalid contract. However, when a trust or will is deemed void as against public policy because the drafting attorney violated the MRPC, the invalidation of the bequest potentially fails to honor the actual and sincere desires of the grantor. [*In re Mardigian Estate*, 312 Mich App at 564.]

In addition, as we have noted earlier, the problematic nature of the *instant* will and trust arises from the *manner* in which these two instruments were formed, not from their *purpose*. Moreover, with respect to fraud, the opinion in support of reversal does not acknowledge the longstanding principle that "[f]raud cannot be presumed, but must be proved." *Brown v Dean*, 52 Mich 267, 271; 17 NW 837 (1883). See also *Goldberg v Goldberg*, 295 Mich 380, 384; 295 NW 194 (1940) ("The burden of showing fraud is upon the person alleging it. Fraud is never presumed, nor is it to be lightly inferred.") (citations omitted). A per se rule of undue influence, however, does exactly that: it presumes the existence of fraud or, more specifically, the existence of undue influence while discharging the contestant's affirmative responsibility to establish that the decedent's free agency has been abrogated.

mention the strong countervailing public policy considerations regarding the decedent's intentions. Our common law and our statutes may be considered the truest indicators of public policy, see *id*. at 66-68, and that common law and those provisions of EPIC strongly favor the discernment and effectuation of the decedent's intentions. MCL 700.1201(b) (providing that EPIC shall be applied "[t]o discover and make effective a decedent's intent in distribution of the decedent's property"); MCL 700.8201(2)(c) (providing that the MTC shall be applied "[t]o foster certainty in the law so that settlors of trusts will have confidence that their instructions will be carried out as expressed in the terms of the trust"); *Kremlick*, 417 Mich at 240 ("A fundamental precept which governs the judicial review of wills is that the intent of the testator is to be carried out as nearly as possible.").

In summary, appellants' public policy arguments are without merit because the "purposes" of the instruments in dispute are not contrary to public policy and because their per se approach fails entirely to consider even the most dominant countervailing public policy considerations set forth in EPIC, namely the decedent's intentions.

## V. CONCLUSION

Among the underlying purposes and policies of EPIC, reflected deeply within our state's caselaw, is the discernment and effectuation of the decedent's intentions in the distribution of his or her property. Indeed, the "guiding polar star" in probate law is that the intentions of the decedent control in this regard. The per se rule of undue influence advocated by appellants would foreclose at some juncture any further consideration of these intentions in favor of an assessment of the behavior of the decedent's attorney.

24

Appellants' per se rule would run contrary to the foundational principles of probate law, longstanding precedents of this state, and the express provisions of EPIC that require the contestant to bear the burden of establishing undue influence. And the adoption of MRPC 1.8(c), which occurred well before our Legislature enacted EPIC, has no effect on our conclusion in this case because a breach of the MRPC is exclusively a basis for invoking the attorney disciplinary process and does not override the substantive law of EPIC. Therefore, we respectfully reject the approach advocated by appellants, endorse the rebuttable presumption of undue influence articulated in *Powers*, and would affirm the judgment of the Court of Appeals for the reasons set forth in this opinion.

Stephen J. Markman
Brian K. Zahra
Elizabeth T. Clement

STATE OF MICHIGAN

SUPREME COURT

---

*In re* MARDIGIAN ESTATE.

---

MARK S. PAPAZIAN, Executor for the
Estate of ROBERT DOUGLAS
MARDIGIAN,

        Appellee,

v

MELISSA GOLDBERG, SUSAN V.
LUCKEN, NANCY VARBEDIAN,
EDWARD MARDIGIAN, GRANT
MARDIGIAN, and MATTHEW
MARDIGIAN,

        Appellants,

and

JP MORGAN CHASE BANK, NA,

        Appellee.

No. 152655

---

MCCORMACK, J. (*for reversal*).

The ethical code that governs every member of the State Bar of Michigan categorically forbids a lawyer from drafting a will for a client that leaves the lawyer a substantial gift. Yet this Court's outdated precedent enables a lawyer to do so anyway. To be sure, that precedent requires the lawyer to show no undue influence was applied to

his client. But that showing is required *after* the client has passed away, giving the lawyer a consequential evidentiary advantage.

The affirming opinion's decision to affirm this precedent leaves clients vulnerable, rewards unscrupulous attorneys, encourages costly litigation, and moreover does not account for the important shifts of the past half-century in our ethics rules, probate law, and evidentiary presumptions. Not all undue influence is equally pernicious: A lawyer who drafts a testamentary instrument that leaves the lawyer a substantial gift in flagrant violation of the professional code of ethics is unique among conflicted beneficiaries in will contests, as she is both an author and beneficiary of the will. To respond, an effective tool is needed.

I would overturn *In re Powers Estate*, 375 Mich 150; 134 NW2d 148 (1965), to the extent that it held that courts should apply a mere presumption of undue influence to a will contest where an attorney has drafted a testamentary document that names himself as a beneficiary. That particular equitable remedy may have been sufficient before significant changes to our ethics code, the law of probate, and our approach to presumptions. But it is no longer sufficient to protect the public. I would therefore replace it with a per se rule of undue influence that voids substantial testamentary gifts to attorney-drafters. Those who draft wills should not benefit from them.

We owe the public better. I would reverse the Court of Appeals.

## I. ANALYSIS

### A. GOVERNING LAW

The Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*., the statutory framework that governs testamentary transfers, was enacted so that "a

2

decedent's intent in distribution of the decedent's property" could be "discover[ed] and [made] effective[.]" MCL 700.1201(b). Thus, the "fundamental precept which governs the judicial review of wills is that the intent of the testator is to be carried out as nearly as possible." *In re Kremlick Estate*, 417 Mich 237, 240; 331 NW2d 228 (1983). The same applies to trust documents. *In re Maloney Trust*, 423 Mich 632, 639; 377 NW2d 791 (1985). To determine the decedent's intent, we read a testamentary document as a whole and, when it contains no ambiguity, enforce it as written. *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 693-694; 880 NW2d 269 (2015).

I agree with the affirming opinion that a court must do all in its power to carry out the testator's intent. That's the whole point: when someone has potentially exerted undue influence on a decedent, courts can no longer be sure that the testamentary instrument, the end product of that alleged influence, accurately reflects the testator's intent. *In re Sprenger's Estate*, 337 Mich 514, 521-522; 60 NW2d 436 (1953); *Detroit Bank & Trust Co v Grout*, 95 Mich App 253, 274-276; 289 NW2d 898 (1980). Testamentary gifts that result from undue influence are void.[1] To establish undue influence, contestants of a testamentary document must show more than mere opportunity: they must show that the testator " 'act[ed] under such coercion, compulsion, or constraint that his own free

_____

[1] EPIC provides for the invalidation of trusts produced by undue influence, see MCL 700.7406 ("A trust is void to the extent its creation was induced by fraud, duress, or undue influence."), and the same rule has been applied to wills, see *In re Anderson Estate*, 353 Mich 169, 172; 91 NW2d 356 (1958) ("Undue influence exercised upon one who makes a will may become the basis for finding the will invalid, if by reason of that influence the right of the testator to freely exercise his discretion in disposing of his property has been taken away from him.").

agency is destroyed. The will or the provisions assailed does not truly proceed from him. He becomes the tutored instrument of a dominating mind . . . .' " *In re Balk's Estate*, 298 Mich 303, 309; 298 NW 779 (1941), quoting *In re Williams' Estate*, 185 Mich 97, 118; 151 NW 731 (1915) (cleaned up).

Generally, the burden of proof rests with the contestant alleging undue influence. MCL 700.3407(1)(c); *Kar v Hogan*, 399 Mich 529, 539; 251 NW2d 77 (1976); *In re Kramer's Estate*, 324 Mich 626, 634-635; 37 NW2d 564 (1949). But this Court has long applied a different framework when an attorney drafts a testamentary instrument for her own benefit. In those cases, we recognized as early as 1897 that the attorney's palpable self-interest "arous[es] suspicion, and raises a presumption more or less strong that undue influence has been exerted . . . ." *Donovan v Bromley*, 113 Mich 53, 54; 71 NW 523 (1897).

Ten years later, we reiterated that it was "generally recognized by the profession as contrary to the spirit of its code of ethics for a lawyer to draft a will making dispositions of property in his favor, and this court has held that such dispositions are properly looked upon with suspicion." *Abrey v Duffield*, 149 Mich 248, 259; 112 NW 936 (1907). The presumption of undue influence, as applied to attorney-drafter-beneficiaries, is the same presumption that applies whenever a testator favors a fiduciary. *Powers*, 375 Mich at 180-181 (opinion by SOURIS, J.). The presumption arises

> upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction. [*Kar*, 399 Mich at 537.]

4

That is, the presumption is no different for an attorney-drafter-beneficiary or another fiduciary-beneficiary, despite the attorney's unique role in preparing the questionable instrument and plain ethical violation in drafting it.

We last examined this presumption against an attorney-drafter in *In re Powers*, more than half a century ago. Maybe it made sense then. For the reasons that follow, I believe it is time to reconsider it.

## B. THE INSUFFICIENCY OF THE PRESUMPTION

In my view, the affirming opinion's decision today to affirm the rebuttable presumption for attorney-drafters fails the testator while protecting the lawyer. To begin, the rebuttable presumption is easily surmountable. The presumption does not change the ultimate burden of proof, which rests with the party alleging undue influence. *Id*. at 538.[2] Its function "is solely to place the burden of producing evidence on the opposing party," *Widmayer v Leonard*, 422 Mich 280, 289; 373 NW2d 538 (1985), but the presumption "has no weight as evidence . . . and cannot be weighed against evidence," *In re Jennings' Estate*, 335 Mich 241, 244; 55 NW2d 812 (1952); see also *In re Cotcher's Estate*, 274 Mich 154, 159; 264 NW 325 (1936) (" '[B]ut, if [the presumption is] challenged by rebutting evidence, the presumption cannot be weighed against the evidence. Supporting evidence must be introduced, and it then becomes a question of weighing the actual

---

[2] See also MRE 301 ("In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party whom it was originally cast.").

evidence introduced, without giving any evidential force to the presumption itself.' ”), quoting *Gillett v Mich United Traction Co*, 205 Mich 410, 414; 171 NW 536 (1919).

In other words, it allows the benefitting party the opportunity to satisfy the burden of persuasion to avoid a directed verdict. *Widmayer*, 422 Mich at 289. But the opposing party can rebut the presumption with “sufficient” evidence. *Kar*, 399 Mich at 542; *In re Peterson Estate*, 193 Mich App 257, 262; 483 NW2d 624 (1991).[3] Overcoming the presumption is hardly a challenge given this modern construction.

And applying the presumption against attorney-drafters (as contrasted with other beneficiary-drafters) ignores the unique status of the attorney. The *Powers* court missed this, stating:

> Whether proponent [i.e., the attorney] used questionable professional judgment in drawing the instrument involved need not be retried; it is irrelevant. Proponent’s status as a member of the bar of Michigan adds not one centimeter, nor subtracts one from his position as a party litigant, and this question should take no time in trial. [*Powers*, 375 Mich at 176.]

That’s not right. The prospect of discerning testator intent when the attorney-drafter is compromised is far harder than for other compromised drafters. Evidence of testator intent is most commonly located in the testamentary document itself and the mind of the attorney who drafted it. While the first is ordinarily the best evidence of intent, *Karam v Law Offices of Ralph J Kliber*, 253 Mich App 410, 424; 655 NW2d 614 (2002), where there is a possibility that the document was the product of undue influence, it is of little

---

[3] I note, however, that there is an open question on what a party must show to rebut the presumption. See, e.g., *In re Mortimore Estate*, 491 Mich 925 (2012) (YOUNG, C.J., dissenting).

6

use. In such a case an attorney-drafter's testimony would be the next surest evidence of intent, given that she was intimately involved with the testator in producing the instrument; indeed, when an attorney-drafter is not the beneficiary of a contested instrument, her testimony can be critical to a court trying to assess testator intent where undue influence on the part of a fiduciary is alleged. See, e.g., *Jennings' Estate*, 335 Mich at 244 ("The presumption was held to have been rebutted and overcome by a showing that the will had been executed after independent legal counsel in [various cases.]"); *In re Grow's Estate*, 299 Mich 133, 140; 299 NW 836 (1941) (noting only that while a presumption might have arisen, the testator "had independent advice of Mr. Phillips, an attorney of Pontiac, in the preparation of his will").[4] But much like the corrupt instrument, an attorney-beneficiary's ethical violation and conflicted position make him not a reliable source.

The affirming opinion seems to presume that that information is easily knowable. But that's exactly the problem. It's not. If we could readily determine Mr. Mardigian's intent, there would be no need for this appeal. But it is precisely because our precedent allows attorneys to draft wills for their own benefit that difficult situations like this arise

---

[4] A treatise section on probate drafting recommends that attorneys "interview the prospective testator alone, or at least not in the presence of anyone who could have a possible interest in disposition of the property, as to his or her desires." 12 Mich Pleading & Practice (2d ed), § 99:48, p 466; see also *In re Hayes' Estate*, 255 Mich 338, 345; 238 NW 245 (1931) (noting, without a hint of concern, that the "will was prepared in the office of a reputable attorney after a private consultation with testator"). When the lawyer herself is the beneficiary, it is impossible for her to interview her client outside the presence of an interested party. And the threat of undue influence is heightened if the attorney-beneficiary consults the client alone. That following *best* practices would lead to *worse* outcomes signals that these instruments are inherently problematic.

and courts must resolve matters *without* the most reliable evidence of testator intent. I don't know how the affirming opinion can be so sure what Mr. Mardigian's intent was. That's the problem unique to attorney-drafter beneficiaries.[5]

## C. PER SE UNDUE INFLUENCE RULE

Because I agree with the affirming opinion that protecting testator intent is our goal, I would adopt a per se rule of undue influence for attorney-drafters.[6] Such a rule ensures that the drafting attorney will be a reliable witness in the search for the testator's true intent. It would make it easier to determine the testator's intent; when a client wants to leave his lawyer a substantial gift the lawyer simply will have an independent lawyer counsel the client and draft the instrument. While a rebuttable presumption might have been a sufficient equitable remedy in a different era, changes in the law and our ethics code make it not much protection at all today.

---

[5] I emphatically reject the affirming opinion's assertion that the testator's intent does not matter to me. It is possible that application of a per se rule might defeat the testator's intent in this case; but it is also possible that the affirming opinion's approach will have that result. But the per se rule I advocate below would end this practice, making it much easier to determine the testator's intent in future cases.

[6] The affirming opinion is concerned that a per se rule would obviate the contestant's burden to show undue influence. Not so. The contestant would have to show that the attorney violated MRPC 1.8(c), which requires showing (1) the attorney drafted the provision leaving himself a gift, (2) the gift was "substantial," and (3) the attorney and client were not related. Once these facts are established the per se rule would take over. This basic framework is no different than invalidating a will after the contestant proves it was signed upon the threat of violence. But it is true that the burden for a litigant contesting an instrument that benefits a drafting attorney would not be the same as with other fiduciary beneficiaries. As it should be.

Courts have equitable powers over the settlement of an estate. MCL 700.1302 and MCL 700.1303. And they have equitable powers to address cases of fraud. *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 590; 702 NW2d 539 (2005). "Undue influence is a species of fraud," and the rules of fraud therefore apply to questions of undue influence. *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710 n 1; 742 NW2d 399 (2007). Courts may apply equitable powers to preserve the integrity of the judiciary as well. *Stachnik v Winkel*, 394 Mich 375, 382; 230 NW2d 529 (1975). The *Powers* presumption was an appropriate equitable tool for its time, but it now should receive an update: a testamentary instrument produced by an attorney-beneficiary should be seen as one that has resulted from undue influence. Full stop.

Generally, to prove undue influence, " '[m]otive, opportunity, or even ability to control' " is insufficient. *In re Karmey Estate*, 468 Mich 68, 75; 658 NW2d 796 (2003), quoting *Kar*, 399 Mich at 537. Instead, "affirmative evidence" must be shown. *Id*. I would hold that a lawyer who drafts testamentary instruments in violation of MRPC 1.8(c) has provided that "affirmative evidence." I reach this conclusion after careful consideration of the substantial changes in the law and in our ethics rules since *Powers*, the need to harmonize probate law and our ethics code, and the special circumstances that set attorneys apart from other fiduciaries.[7]

I don't share the affirming opinion's concerns about a per se rule. First, the idea that a per se rule would somehow usurp the role of the Legislature rests on a flawed

---

[7] Because I would overrule *Powers* directly and rely on our equitable authority to establish a new rule, I decline to address respondents' argument that wills and trusts can be held void as against public policy under MRPC 1.8(c).

9

premise; the suggestion that EPIC has somehow codified the *Powers* presumption is simply not correct. For one thing, the Legislature provided "undue influence" as a basis to invalidate a will, MCL 700.3407(1)(c), but it has not defined the term. Nowhere does it mandate a "rebuttable presumption" as the standard for assessing undue influence, whether for attorneys or anyone else. Rather, this Court invented that doctrine. *Donovan*, 113 Mich at 54.[8]

## 1. CHANGES TO LAW SINCE *POWERS*

*Powers* was decided in a different legal world. The rules of professional conduct, probate law, and our approach to rebuttable presumptions have all changed significantly since 1965. Considered together, those changes require an updated approach to our old rule if we are serious about protecting the public in this context.

### a. ETHICS RULES AND THEIR ENFORCEMENT

Bear with me; this part is a bit of a slog. Over the last century or so, a sea change has occurred in how the legal profession views and operationalizes its ethics rules. When

---

[8] And the affirming opinion's reasoning on this point cites a particularly questionable use of legislative history. It cites the EPIC Reporter's Commentary to support the proposition that MCL 700.3407 merely restated the law of burdens of proof, presumptions and all, so that any change to the *Powers* presumption risks contravening the statute. See Martin, *Estates and Protected Individuals Code with Reporters' Commentary* (ICLE, 2001), p 77. But the Reporter's Commentary—an item the Legislature never acted upon—does "not involve an act of the Legislature" and thus has "considerably diminished" use for courts. *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). Thus, the notion that EPIC has incorporated, or otherwise precludes us from revisiting, the *Powers* presumption is not borne out by the statutory text but instead relies in part on the affirming opinion's novel use of legislative history. I am not convinced.

this Court first introduced the presumption of undue influence in the context of an attorney-beneficiary of an estate at the end of the nineteenth century, there was no formal code of ethics governing lawyers; only personal morality and specific statutes governed lawyer conduct. See Niehoff, *In the Shadow of the Shrine: Regulation and Aspiration in the ABA Model Rules of Professional Conduct*, 54 Wayne L Rev 3, 5-6 (2008); Wolfram, *Toward a History of the Legalization of American Legal Ethics-II The Modern Era*, 15 Geo J Legal Ethics 205, 206 (2002) ("The early history of American legal ethics gave no indication that lawyers would one day become a highly regulated profession. For the most part, regulation was highly traditional, episodic, and reactive, and was addressed primarily to pathological extremes of lawyer behavior."). If attorney conduct was regulated, it was case by case in litigation. 1 Hazard et al, The Law of Lawyering (4th ed), § 1.08, p 1-29. And "[p]rior to the late 1800's there were no conflict of interest rules as such[.]" Flamm, Conflicts of Interest in the Practice of Law: Causes and Cures (2015), p 30.

Alabama produced the nation's first ethical code in 1887, and the ABA built upon that code when it issued the 1908 Canons of Ethics. Hazard, *Law of Lawyering* at §§ 1.09 and 1.10, pp 1-31, 1-32.[9] Even where adopted, however, the Canons did not have the force of law, and ethics opinions interpreting the Canons did not even bind the parties to the case. *Id*. at § 1.10, p 1-32. Instead, the Canons were merely aspirational and

---

[9] See also American Bar Association, *Final Report of the Committee on Code of Professional Ethics*, <https://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2015-aba-annual/2015_aba_annual_wm/2p_1_1908_canons_of_ethics.authcheckdam.pdf> (accessed June 13, 2018) [https://perma.cc/TR8D-HFZY], which includes the 1908 Canons.

11

offered vague statements "set forth in courtly prose rather than in the style of black letter law, and . . . [speaking] more to matters of etiquette than legal obligation or professional duty." *Id.* So they had little in common with enforceable rules, as they were too broad and general to guide behavior meaningfully, Strassberg, *Taking Ethics Seriously: Beyond Positivist Jurisprudence in Legal Ethics*, 80 Iowa L Rev 901, 907-908 (1995),[10] and were rarely invoked, Wolfram, *Toward a History of the Legalization of American Legal Ethics-I. Origins*, 8 U Chi L Sch Roundtable 469, 485 (2001). None of the Canons specifically addressed self-interested attorney-drafters. de Furia, Jr, *Testamentary Gifts from Client to the Attorney-Draftsman: From Probate Presumption to Ethical Prohibition*, 66 Neb L Rev 695, 699 (1987).

In 1935 this Court first tried to codify the ethical responsibilities of members of the State Bar. That year the Court adopted the Canons of Professional Ethics of the American Bar Association.[11] The 32 Canons, like the ABA's 1908 Canons, were

---

[10] As Justice Harlan Stone lamented, "Our canons of ethics for the most part are generalizations designed for an earlier era." Stone, *The Public Influence of the Bar*, 48 Harv L Rev 1, 10 (1934).

[11] In 1935 the Legislature passed 1935 PA 58, giving this Court the authority to create and regulate the State Bar of Michigan. Under that statute, the Court adopted the Supreme Court Rules Concerning the State Bar of Michigan and the Canons of Professional Ethics of the American Bar Association. See *Supreme Court Rules Concerning the State Bar of Michigan*, 15 Mich State B J 12, 17 (1936) ("Section 14 – Rules of Professional Conduct. The ethical standards relating to the practice of law in this state shall be the present Canons of Professional Ethics of the American Bar Association, and those which may from time to time be announced or recognized by the Supreme Court of this State."); *Canons of Professional Ethics*, 15 Mich State B J 42 (1936).

typically abstract, aspirational, and short on notice of prohibited conduct.[12]  See *In the Shadow of the Shrine*, 54 Wayne L Rev at 6-7.  Relevant to this appeal, only Canon 11 of the Canons of Professional Ethics advised bar members on how to handle trust property.

Canon 11, the amended version of which the Court adopted in 1938, provided in full:

> Dealing with Trust Property.
>
> The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.
>
> Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him.[13]

---

[12] Some scholars have suggested that the Canons were not "a serious effort [to] set[] a national standard for lawyer behavior; indeed, in the sense described, they were just the opposite."  *In the Shadow of the Shrine*, 54 Wayne L Rev at 7.  It was not until the Canons were adopted by most states, the ABA grew in membership and influence, and the ABA issued opinions to clarify the Canons that the Canons became authoritative.  *Id*.

[13] *Canons of Professional Ethics*, 17 Mich State B J 483, 486 (1938).  The original version of Canon 11 in both the 1908 ABA Canons of Professional Ethics and the 1935 Michigan Canons of Professional Ethics did not contain the phrase "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client."  See *Rule 11*, *Canons of Professional Ethics*, 15 Mich State B J 42, 45 (1936).  The Canon was amended by the ABA in 1933 and 1937, and this Court adopted the language in full in 1938.  See American Bar Association, *ABA Canons of Professional Ethics*, <https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc_migrated/Canons_Ethics.authcheckdam.pdf> (accessed on June 13, 2018) [https://perma.cc/JT2Q-TRMM].

Canon 11 therefore only advised that lawyers "should refrain" from actions taking advantage of their client's confidence; it did not explicitly prohibit a lawyer from receiving a gift under a testamentary instrument the lawyer drafted. What is more, the Court adopted no detailed or functional grievance procedure.[14]

Under these rules, an attorney who drafted a will to which she was a beneficiary suffered no consequences. For one example, the State Bar's Committee on Professional and Judicial Ethics issued an ethics opinion on this topic in 1948. Opinion 112, 1948, 29 Mich State Bar J 141 (1950). The attorney who was the subject of the opinion was indebted to his client and drafted the client's will discharging the attorney of all debt. *Id*. Citing our older opinions on the topic, the Committee stated that it could not "assume that the lawyer had improper motives," but "the circumstances are such as to place him in a most unfavorable light." *Id*. at 142. The Committee concluded that an attorney here could not ethically draft such a will. *Id*. at 142-143. But the upshot of the opinion was only that the Bar received some theoretical instruction on ethics; the unnamed attorney presumably remained debt-free.[15]

---

[14] While this Court did adopt some disciplinary mechanisms in 1935 when it adopted the Supreme Court Rules for the State Bar of Michigan, it was not until 1947 that the Court clarified and expanded the grievance procedure for attorney misconduct. See Rule 15, *Supreme Court Rules Concerning the State Bar of Michigan*, 317 Mich xxxix, xlvi (1947). Since 1947 this Court has repeatedly amended the Rules Concerning the State Bar of Michigan to strengthen the attorney grievance procedure. See, e.g., *Amendments to the Supreme Court Rules Concerning the State Bar of Michigan*, 343 Mich lxi, xliii (1955); *Amendments to the Supreme Court Rules Concerning the State Bar of Michigan*, 369 Mich xxxiii, xxxiv (1963).

[15] We see the same outcome in another ethics opinion, where the attorney drafted a will naming himself as executor of the estate and leaving himself a sizeable fee—10 percent of the estate. Opinion 144, 1951, 57 Mich State Bar J 181 (Special Issue, 1978).

14

This was the professional-rules backdrop against which the question we decide here was last considered in *Powers*. A lot happened next.

In 1971, this Court tried to provide additional guidance to the profession by adopting parts of the Code of Professional Responsibility of the American Bar Association, issued two years earlier.[16] The ABA Code contained aspirational "Ethical Considerations," one of which suggested somewhat tepidly that a lawyer should usually not accept a testamentary gift if the lawyer drafted the testamentary instrument.[17] But once again, the Ethical Considerations did not create enforceable rules.[18] And we did not

---

[16] See *Court Considers Modified ABA Canons and Rules for Michigan*, 50 Mich State B J 56, 56-68 (1971); see also Carty, *Money for Nothing? Have the New Michigan Rules of Professional Conduct Gone Too Far in Liberalizing the Rules Governing Attorney's Referral Fees?*, 68 U Det L Rev 229, 234 (1991). The ABA Model Code of Professional Responsibility was adopted by the ABA in 1969.

[17] This Ethical Consideration stated:

> A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or overreached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client. [Ethical Consideration 5-5, American Bar Association, *ABA Model Code of Professional Responsibility,* <https://www.americanbar.org/content/dam/aba/migrated/2011_build/professional_responsibility/mod_code_prof_resp.authcheckdam.pdf> (accessed June 13, 2018) [https://perma.cc/8YQY-TQ5R]].

[18] See *In the Shadow of the Shrine*, 54 Wayne L Rev at 8 (noting the Ethical Considerations' aspirational nature); ABA Comm on Evaluation of Prof Standards, *Report to the House of Delegates* (January, 1982), p 2 ("As explained in the [Model] Code Preamble, it was the intent of the Wright Committee [which drafted the Code] that

adopt the Ethical Considerations but only the Canon statements and associated Disciplinary Rules. See *Code of Professional Responsibility and Canons*, 385 Mich lvi, lvi-xc (1971). Neither the Disciplinary Rules nor the Canon statements contained any rule governing a lawyer who drafts a testamentary instrument under which the lawyer takes a gift.

Things changed in an important way with the ABA's Model Rules of Professional Responsibility in 1983. Professor Geoffrey Hazard, Jr., the reporter for the ABA commission that produced the Model Rules, stated that the ethical rules should establish " 'the lawyer's legal obligations and not [be] expressions of hope as to what a lawyer ought to do.' " Peters, Note, *The Model Rules as a Guide for Legal Malpractice*, 6 Geo J Legal Ethics 609, 611 (1993), quoting Hazard, Jr., *Legal Ethics: Legal Rules and Professional Aspirations*, 30 Clev St L Rev 571, 574 (1982). In other words, the rules should have some teeth.[19] See generally Painter, *Rules Lawyers Play By*, 76 NYU L Rev 665, 668 (2001) ("The evolution of professional responsibility rules in the last century reveals several important trends. First, codes have migrated away from broad standards and toward clearly defined rules."). That view was reflected in the report of the ABA

---

the Code's Canons and Ethical Considerations be and remain unenforceable."), available at <https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/ kutak_2-82.authcheckdam.pdf> (accessed June 13, 2018) [https://perma.cc/SMKX-RLXM].

[19] As Professor Hazard noted, the "Model Rules were set forth in the manner of a true code—mandatory conduct rules, without the 'softening' addition of hortatory provisions that were meant to inspire rather than command." Hazard, *Law of Lawyering* at § 1.12, p 1-35.

commission that drafted the Rules. The commission's "objective . . . was to produce rules of professional conduct that preserve fundamental values while providing realistic, useful guidance for lawyer conduct in an environment that finds the profession and the practice of law, like American society itself, undergoing significant change." ABA Comm on Evaluation of Prof Standards, *Report to the House of Delegates* (June 30, 1982), p 1.[20] The report also noted that the then-effective Model Code left many "gaps in what should be a comprehensive statement of professional standards." *Id*. A lawyer who consults the ethical rules, the committee observed, should have "reliable guidance as well as fair warning and fair limitation." ABA Comm on Evaluation of Prof Standards, *Report to the House of Delegates* (January, 1982), p 4.

The Rules, then, were meant to eliminate flimsy aspirational ideals and draw (at least some) clear lines. *In the Shadow of the Shrine*, 54 Wayne L Rev at 10.[21] And, relevant here, Model Rule 1.8(c) prohibited an attorney from drafting a testamentary

---

[20] This report is available at <https://americanbar.org/content/dam/aba/administrative/professional_responsibility/kutak_8-82.authcheckdam.pdf> (accessed June 13, 2018) [https://perma.cc/V4XW-7TZ4]. See also *id*. at 2 ("But filling in gaps in the 1969 Code was only part of the assignment. Experience has shown that the Code, in many cases, is difficult to interpret and apply. There is a need for standards that are more understandable and more readily useful to lawyers in everyday practice. The bar is serious about self-regulation and enforcement of its standards. But it must be recognized that enforcement will not be achieved primarily through disciplinary agencies. Like any other body of law, the law of lawyering depends on self-enforcement and widespread voluntary compliance if its ends are to be met. And the achievement of voluntary compliance depends, in turn, on the existence of clear, workable rules.").

[21] Proponents of the change in Michigan, including the State Bar, argued that the Model Rules provided clear guidance in the form of mandatory law familiar to practitioners. See ABA/BNA Lawyers' Manual on Professional Conduct, Current Reports (Feb 22, 1984), pp 70-71.

document leaving herself a substantial gift. To be sure, this general approach of mandatory rules marked a fundamental change. See generally Zacharias, *Specificity in Professional Responsibility Codes: Theory, Practice, and the Paradigm of Prosecutorial Ethics*, 69 Notre Dame L Rev 223, 223 (1993) ("Over time, the professional codes governing lawyer behavior have become statutory in form. Modern codes increasingly tell lawyers how they must act."); Hazard, *The Future of Legal Ethics*, 100 Yale L J 1239, 1241 (1991) ("[The ethical] norms have become 'legalized.' The rules of ethics have ceased to be internal to the profession; they have instead become a code of public law . . . .").

In 1988, this Court adopted Model Rule 1.8(c), along with many others, when it promulgated the current version of the Michigan Rules of Professional Conduct (MRPC).[22] For the first time, Michigan's professional rules specifically addressed a lawyer's obligations when preparing a testamentary gift:

---

[22] The ABA adopted the Model Rules of Professional Conduct in 1983. This Court did not adopt the Model Rules in full, instead making several modifications. See MRPC 1.10; compare Model Rules of Professional Conduct, Rule 1.10; see MRPC 3.6; compare Model Rules of Professional Conduct, Rule 3.6. At the time, ABA Model Rule of Professional Conduct, Rule 1.8(c) mirrored MRPC 1.8(c). See American Bar Association, *A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982-2005* (Chicago: American Bar Association, 2006), p 184. In 2002, the ABA amended Model Rule 1.8(c). *Id.* at pp 197-211. Rule 1.8(c) of the Model Rules of Professional Conduct now provides in full:

> A lawyer shall not solicit any substantial gift from a client, including a testamentary gift, or prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift unless the lawyer or other recipient of the gift is related to the client. For purposes of this paragraph, related persons include a spouse, child, grandchild, parent, grandparent or other relative or individual with whom the lawyer or the client maintains a close, familial relationship.

A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee.[23]

We have not amended MRPC 1.8(c) since its adoption.

The affirming opinion today gives these changes short shrift: these important changes in the rules governing lawyers, and specifically MRPC 1.8(c), should force us to rethink the *Powers* presumption.

Ethical principles have always undergirded suspicions about testamentary gifts to an attorney-drafter. See *Abrey v Duffield*, 149 Mich 248, 259; 112 NW 936 (1907).[24] When the governing ethics principle was a squishy recommendation, a rebuttable presumption was an appropriate equitable response. When Dr. Lunette Powers' attorney drafted his client's will to leave a substantial gift to the attorney's wife, he violated no clear ethical rule, as there was none.

But attorney Papazian drafted his client's will and trust in clear violation of MRPC 1.8(c). His transgression is simply of a different kind and scope than that of Dr. Powers' attorney. And that difference means the *Powers* presumption should no longer be the appropriate equitable tool for determining undue influence. The resulting will or trust is the fruit of the ethical transgression. And so, when an attorney seeks to enforce his or her

---

This Court has yet to adopt these amendments.

[23] MRPC 1.8 governs "Prohibited Transactions."

[24] This Court has been bemoaning such gifts since the *fin de siècle*. *Donovan*, 113 Mich 53. And thousands of years before that, going as far back as ancient Rome, these sorts of instruments have been forbidden. *Testamentary Gifts from Client to the Attorney-Draftsman*, 66 Neb L Rev at 697.

19

ethically prohibited work product, a court is put in the position of essentially aiding the swindle. See *Succession of Cloud*, 530 So 2d 1146, 1150 (La, 1988) ("When an attorney enters into a contract with his client in direct and flagrant violation of a disciplinary rule and a subsequent civil action raises the issue of enforcement (or annulment) of the contract, this court, in order to preserve the integrity of its inherent judicial power, should prohibit the enforcement of the contract which directly contravenes the Code adopted by this court to regulate the practice of law.").

In a closely related context, we have declined to allow courts to be conscripted into unethical enterprises. Indeed, we have endorsed the view that it is nonsensical for courts to uphold unethical fee agreements when those agreements will subject the attorney to discipline for violating our professional rules. See *Abrams v Susan Feldstein, PC*, 456 Mich 867 (1997) (reversing and agreeing with the Court of Appeals dissent). The Court of Appeals has followed suit. See, e.g., *Evans & Luptak, PLC v Lizza*, 251 Mich App 187, 196; 650 NW2d 364 (2002) (quoting Judge GRIFFIN's dissent in *Abrams* for the proposition that it would be " 'absurd' " to allow an attorney to enforce a fee agreement forbidden under our ethics rules); *Speicher v Columbia Twp Bd of Election Comm'rs*, 299 Mich App 86, 91-93; 832 NW2d 392 (2012) (noting that "courts have the authority and obligation to take affirmative action to enforce the ethical standards set forth by the Michigan Rules of Professional Conduct" and therefore refusing to enforce a contract violating the ethical rules).[25] The same principles should require courts to strike down testamentary gifts to an attorney-drafter.

[25] These cases were resolved because the ethical rules were public policy, and that the agreements were void for violating that policy. See, e.g., *Evans & Luptak, PLC*, 251

20

## b. OTHER RELEVANT CHANGES IN THE LAW

Not surprisingly, change has also come to our probate laws in the 60-plus years since we decided *Powers*. Indeed, the entire legal system governing probate has gone through two series of significant changes that introduced and modified an informal probate procedure. The affirming opinion does not address these changes at all, but I find them critical. In 1978, the Legislature developed "independent" probate as an alternative to supervised probate. 1978 PA 642, art 1, § 7 (codified at 1979 CL 700.7). Independent probate favored less court supervision than supervised probate—the approach in place at the time of *Powers*. *Id*. (defining "independent probate" as "probate designed to operate without unnecessary intervention by the probate court as provided in article 3"); Foster & Zack, *Informal Estate Proceedings in Michigan* (2000), p 1-1 (noting that "the probate register," and not the court, "made decisions and signed documents throughout independent proceedings from commencement to the certificate of completion"). This alternative was retained, with modifications, as "informal" probate in our present system, EPIC, 1998 PA 386, § 3301 (codified at MCL 700.3301). Informal proceedings are the process "for probate of a will or appointment of a personal representative conducted by the probate register without notice to interested persons." MCL 700.1105(b); see also

Mich App at 189 ("We hold that the alleged contract is unethical because it violates the Michigan Rules of Professional Conduct (MRPC). Furthermore, we hold that unethical contracts violate our public policy and therefore are unenforceable."). In the present context, by contrast, there is no need to resort to public policy because our Court has long had the power to establish the law of fraud, as explained above. So I would not lend the rule itself substantive effect, nor must I look to it here as the definitive expression of public policy.

MCL 700.3301 (describing procedures for informal probate).[26]  Formal proceedings, by contrast, take place before a judge and require notice to interested persons.  MCL 700.1104(h).  These changes created and normalized probate processes with diminished judicial involvement and oversight.

In addition to the changes to probate law, our approach to rebuttable presumptions in the broader civil context has changed.  A few months before we decided *Powers*, we held that a rebuttable presumption itself could sometimes be weighed as evidence.  *In re Wood Estate*, 374 Mich 278, 294; 132 NW2d 35 (1965).  A jury had to be instructed to apply a presumption unless it was rebutted.  In other words, under this view "the presumption is 'evidence,' to be weighed and considered with the testimony in the case." 2 McCormick, Evidence (7th ed), § 344, p 699.  This gave the presumption greater effect and turned it into a "burden shifting device: Once the presumption was established, the burden shifted to the opponent to establish that the presumed fact was not true.  Moreover, even if rebutted, the presumption was to be presented to the jury as a conditional mandatory inference."  1 Mich Court Rules Practice, *Evidence* (3d ed), § 301.2, p 171.

But in *Widmayer v Leonard*, we rejected this approach to presumptions and established the weaker presumption rule discussed above.  *Widmayer*, 422 Mich at 289. Thus, the presumption no longer has evidentiary weight and can be rebutted by "sufficient" evidence.  *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 701; 880

[26] These alternative procedures appear to be widely used.  Shortly before EPIC was passed, more than 70 percent of estates began in independent administration.  Foster & Zack, p 1-2.  The trend away from formal probate continued after EPIC took effect.  *Id.*

NW 2d 269 (2015). When it is, the presumption drops out of the case and does not shift the burden of persuasion. 2 McCormick, § 344, p 692 ("[T]he only effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. If that evidence is produced by the adversary, the presumption is spent and disappears."); 1 Mich Court Rules Practice, § 301.2, p 172 ("Presumptions do not shift the burden of persuasion."). Presumptions under this approach have thus been described as "not very significant at all." Benson, *Michigan Rule of Evidence 301, I Presume*, 87 Mich B J 34, 36 (Aug 2008); see also 2 McCormick § 344, p 694 (noting that this approach is criticized for "giving to presumptions an effect that is too 'slight and evanescent' ") (citation omitted). In other words, the work that the presumption could be counted on to do when *Powers* was decided is diminished considerably.

The combination of these changes is a boon to the unethical lawyer. The probate system is easier to navigate without court involvement. And decreased judicial oversight means it is less likely that unscrupulous lawyers are found out; it is easier for them to escape with their testamentary boodle. And if they are questioned, the rebuttable presumption of yesterday is a far lower hurdle to clear for today's lawyers than it was in 1965 for Dr. Powers' lawyer. The affirming opinion does not explain why a court-fashioned rule that made sense before these changes still makes sense.

## 2. ADVANTAGES OF A PER SE UNDUE INFLUENCE RULE

In my view these changes in the law underscore why attorney-beneficiary instruments should be prohibited. A per se rule would harmonize probate law and MRPC 1.8(c), and get courts out of both the difficult business of struggling to discern testator

23

intent when the primary sources are unreliable and the distasteful business of approving attorneys' ethical workarounds.[27]

Harmonizing these rules is also efficient. A rebuttable presumption forces the parties into a messy undue influence battle in probate court. Inefficiencies multiply when a party aggrieved by the lawyer's misconduct seeks restitution in a parallel grievance proceeding. The result is nasty, poor, brutish, and long. This case illustrates the point: litigation has been ongoing since February 2012, roughly one dozen law firms have been involved so far, and its documentary record fills five-and-a-half boxes and spans many thousands of pages.[28] Although the parties dispute whether Mardigian intended to leave his estate to his family or his attorney, surely he did not intend to create that acrimony. But acrimony is inevitable given the current conflicting rules. And so contests become Dickensian parody.[29]

---

[27] A per se rule would not, however, overwhelm the ordinary rule that undue influence may be rebutted, for attorneys are unique among fiduciaries in many ways. First, only lawyers are bound by MRPC 1.8(c). Second, lawyers are an indispensable part of the will-drafting process and routinely relied on by courts to be neutral witnesses about a client's intent. E.g. *In re Teller's Estate*, 288 Mich 193, 199; 284 NW 696 (1939), overruled in part on other grounds by *Wood Estate*, 374 Mich 278. And third, because of their legal training and intimate relationship with the client, they are well-poised to exert undue influence. See *In re Henderson*, 80 NY2d 388, 394; 605 NE2d 323 (1992).

[28] See too *Powers*, when the Court lamented how the case had consumed "8-weeks' trial, an infinity of time in legal research and briefing, a prodigal amount of money, and the expenditure of sorely needed judicial time." *Powers*, 375 Mich at 176.

[29] Cf. Dickens, *Bleak House* (London: Bradbury & Evans, 1853), p 3 ("This scarecrow of a suit has, in course of time, become so complicated, that no man alive knows what it means. . . . Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it. . . . The little plaintiff or defendant, who was promised a new rocking-horse when Jarndyce and

The framers of Rule 1.8(c) presaged this concern. During debates, the ABA voted down a proposal by the New York Bar to make Rule 1.8(c) a flexible rule by amending it to state that a lawyer "ordinarily" should not draft such instruments. ABA, *A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982-2005*, p 187. The ABA instead doubled down, making the Rule unwaivable by clients, unlike many other rules, and by providing that the conflict of interest it creates is imputed to all members of a lawyer's firm. See Hazard, *Law of Lawyering* at § 13.14, p 13-32. The reason for these exacting prophylactic rules was to "reduce even the possibility of later recriminations or a later will contest that could frustrate the client's intentions." *Id*.

A per se rule of undue influence would accomplish the same goals. And it would restore some dignity to the oft-maligned legal profession. Instead the affirming opinion says on the one hand that a lawyer is prohibited from preparing a testamentary instrument that leaves a substantial gift to herself and then permits its enforcement when the corrupt instrument is challenged. I am deeply troubled that the opinion leaves in place a rebuttable presumption regime that provides a roadmap for unethical attorneys.

## II. CONCLUSION

Over a century ago this court recognized that an attorney who drafts a client's will leaving himself a substantial gift presented a special problem for a court whose job it is to protect the testator's intent. In my view, changes in the law and in the rules governing the conduct of lawyers make the historical remedy this court adopted to handle this

---

Jarndyce should be settled, has grown up, possessed himself of a real horse, and trotted away into the other world.").

problem—a rebuttable presumption of undue influence—no longer sufficient to protect the public. Yes, lawyers who violate their ethical duties to clients can be punished in the disciplinary process. But that only solves part of the problem. Because I agree with the affirming opinion that testator intent is paramount, I would update our equitable remedy to ensure that intent is respected. Our equitable remedy can and should reflect the updates to the relevant substantive law and ethics rules.

In not doing so, the court protects compromised lawyers over the public. I would have reversed the Court of Appeals.

Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

WILDER, J., took no part in the decision of this case because he was on the Court of Appeals panel.

26