# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* WILLA M. DURHAM LIVING TRUST.

---

| | |
|---|---|
| MARTIN FOLEY and BONNIE L. KONOUCHUK, Successor Trustee of the WILLA M. DURHAM LIVING TRUST, | UNPUBLISHED<br>November 29, 2018 |
| Appellees, | |
| v | No. 338687<br>Macomb Probate Court |
| PAMELA PFEIFER, | LC No. 2014-213277-TV |
| Appellant, | |
| and | |
| LINDA FOLEY, DUANE ERROL FOLEY, JENNIFER FOLEY, JACK L. PLUMMER, KIMBERLY PHIPPS, MARK PHIPPS, JERRY PHIPPS, JASON PHIPPS, EMANUEL HAVARIAS, BILLIE JO PHIPPS, SHIRLEY MORGAN, ANN DILYARD, LARRY FOLEY, and JEFFREY FOLEY, | |
| Other Parties. | |

---

Before: JANSEN, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

Appellant, Pamela Pfeifer, appeals by delayed leave granted[1] the probate court's order (1) setting aside the seventh amendment to the Willa M. Durham Living Trust, dated February 21, 2007, and amended and restated in its entirety by fifth amendment dated April 4, 2011 (the

---

[1] *In re Willa M Durham Living Trust*, unpublished order of the Court of Appeals, entered November 8, 2017 (Docket No. 338687).

-1-

Trust); (2) removing appellant as the successor trustee; and (3) appointing appellee Bonnie L. Konouchuk as the successor trustee. This order was entered following a jury trial in which the jury returned a verdict that the decedent, Willa M. Durham, made the seventh amendment to the Trust as a result of undue influence by appellant. The probate court denied appellant's motion for judgment notwithstanding the verdict (JNOV) or a new trial, and the probate court also denied appellant's motion for reconsideration. For the reasons set forth in this opinion, we vacate the probate court's judgment and remand this matter for entry of JNOV in appellant's favor.

## I. BACKGROUND

The decedent died in January 2013. Appellant, who was the decedent's niece, was the successor trustee of the Trust. The decedent's nephew, Martin Foley, subsequently filed a petition to set aside the December 15, 2012 seventh amendment to the Trust and to remove appellant as successor trustee. According to the petition, Martin, appellant, and Jeffrey Pfeifer (appellant's son) would have each received a share of the trust property in the amount of "10% or $100,000 whichever is greater" under the fifth amendment to the Trust. However, the seventh and final amendment to the Trust changed this distribution, reducing Martin's share of the trust property to $25,000 and providing that the residual of the Trust and the decedent's estate would go to appellant, per stirpes. In his petition, Martin further alleged the following, as relevant to this appeal:

> 15. Pamela K. Pfeifer had the access and opportunity to influence Willa M. Durham's decisions, including her decision to execute the Seventh Amendment.

> \* \* \*

> 17. The Seventh Amendment of the Trust directly benefitted Pamela K. Pfeifer and Jeffery Pfeifer, her son, as each of their shares of the Trust was significantly increased by potentially more than Two Hundred Thousand Dollars ($200,000.00).

> \* \* \*

> 24. Even though it has been two (2) years since the death of Willa M. Durham, upon information and belief, Pamela K. Pfeifer, the Successor Trustee, has not made any distributions to the Beneficiaries.

> \* \* \*

> 27. The Seventh Amendment was purportedly executed by Willa M. Durham because she was told that the potential value of her trust estate would be much less than the One Million Dollars ($1,000,000.00) that was the reference figure prior to the Seventh Amendment and she was told that the Seventh Amendment would adjust for that decrease, when, in fact, the prior Trust and Amendments already had a mechanism to adjust for any decrease or increase in the ultimate value of her trust assets.

-2-

28. The Seventh Amendment not only made unnecessary changes to purportedly deal with a possible decrease in the value of the Trust assets, but also made a massive change by increasing the amounts that would potentially be bequested to Pamela K. Pfeifer and Jeffery Pfeifer, her son, at the expense of the other beneficiaries. . . .

29. It appears that the above change was incorporated into the Seventh Amendment by greatly reducing the bequests to the other beneficiaries and for the first time after six (6) prior amendments, naming Pamela K. Pfeifer and Jeffery Pfeifer, her son, as the residual beneficiaries, so that the substantial majority of the Trust Assets would go to them without using specific dollars amount [sic] as was done in prior amendment and for all other beneficiaries.

As pertinent to the instant appeal, Martin alleged that the seventh amendment was void as a result of being induced by the undue influence of appellant. Martin requested that the probate court set aside the seventh amendment and remove appellant as the successor trustee.

The matter proceeded to a jury trial. At trial, Martin testified that his mother was the decedent's sister. He had a good relationship with the decedent and saw her frequently, ranging from once every couple of weeks to four or five times a week. Martin testified that after the decedent's fourth husband, Ersnest Durham, died in 2004, he ran errands, took the garbage out, and was "company" for the decedent, who lived approximately 75 miles from him. He first learned of appellant at Ernest's funeral. Martin never saw appellant at the decedent's house, but he would see other family members and friends there helping the decedent. According to Martin, the decedent had an eighth or ninth grade education, and Ernest always took care of bookkeeping and paying the bills when he was alive. The decedent owned three houses, two of which she rented out, and a vacant parcel of land. Martin testified that the decedent had told him approximately 15 or 20 years earlier that she was going to leave him $100,000. He knew that the decedent had a trust, but he never saw the document or knew its terms. The decedent did not discuss the details of the various trust amendments with Martin.

Emanuel Havarias met the decedent and Ernest in the 1980s. Havarias testified that he and appellant both helped the decedent pay bills and balance her checkbook after Ernest passed away. Havarias saw appellant frequently at the decedent's house. The decedent told Havarias that she was leaving him $100,000 and that she was leaving some money to appellant's son. The decedent also told Havarias that she had named appellant as successor trustee. According to Havarias, he knew that the decedent made many changes to her trust and that she would take people who made her mad out of the trust. Havarias testified that appellant was "a very caring person" and that he did not know of any undue influence exerted by appellant over the decedent.

Appellant testified that her father was the decedent's brother and that her father did not acknowledge to the Foley family that appellant was his daughter. While Ernest was still alive, appellant would visit the decedent and Ernest at their house and would speak with the decedent on the telephone. The decedent and Ernest also went to appellant's house for Christmas.

According to appellant, the decedent added appellant as a co-owner on her checking account in 2005. Appellant also testified that in 2006 or 2007, the decedent met with an attorney

named Wayne Stewart, of the law firm of Stewart and Bruss, to create a trust. Appellant further testified that although she went with the decedent to her initial meeting with Stewart, it was the decedent who was interested in creating a trust, who initiated the discussion about meeting with an attorney, and who selected Stewart as the attorney to create the Trust. The decedent told appellant that she would name appellant as trustee. Appellant did not take the decedent to any other meetings with Stewart. However, she was at the decedent's house one time when Stewart met with the decedent but was not involved in their discussion or told about what they discussed. According to appellant, the decedent gave appellant a copy of the Trust in "2009 or something." Appellant did not recall how much money she was to receive under the terms of the Trust at that time, but she recalled that she was named as the successor trustee. She was aware that the Trust was based on an estimated estate value of $1 million. Appellant testified that the decedent would "always tell me well, I changed it, or I took so and so out. She would call me. She called me almost every day or I called her." Appellant further testified that she had no role in the creation of the original version of the Trust or any of the amendments, that she never talked to the decedent about what the terms of the Trust or the amendments should be, and that she never talked to the attorneys about what the terms of the Trust or the amendments should be. When the decedent died, appellant claimed the money in bank accounts of which she was a co-owner because those accounts were not assets of the Trust.

Appellant further testified that the decedent saw Jeffrey "basically, all his life." According to appellant, the decedent sent Jeffrey some money for his college graduation and was happy that Jeffrey planned to go to law school. The decedent told appellant that she would leave some money in the Trust for Jeffrey to use to pay for law school, but appellant did not recall whether Jeffrey was a named beneficiary in the copy of the Trust that appellant had.

After the decedent's death, appellant contacted the Stewart and Bruss law firm and saw the seventh amendment to the Trust for the first time, at which time she learned that she had been left the residual of the Trust. According to appellant, the decedent had verbally instructed her to sell the assets that were in the home upon her death and put the proceeds from the sale into the Trust to be distributed. The decedent had also told appellant that the deeds to her properties were in her purse and that the law firm also had copies of the deeds, which were recorded after the decedent's death. Before selling the real estate, appellant had to evict the decedent's nephew from the decedent's home and evict the decedent's niece from the property next door to the decedent's home. Appellant testified that during the three months that it took to evict them, they "had trashed everything" and had "taken everything . . . of any value" that she was supposed to sell, including a $12,000 grandfather clock, diamond rings, and furniture. The decedent's vacant property sold for $65,000, the home decedent lived in sold for $185,000, and the farmhouse next door sold for $100,000. The farmhouse was sold on a land contract. Another piece of property containing a house had not yet been sold at the time of trial.

Appellant explained that the trust currently had $264,000 in assets, which represented the monies received from the sale of the three properties. She testified that there were outstanding bills owed by the trust totaling approximately $200,000, that the $120,000 in specific bequests to the beneficiaries had not yet been paid, that it was possible that there would not be enough money in the Trust to cover the specific bequests, and that it was possible that she would not receive any money from the Trust.

Janet Bruss testified that she first became involved in decedent's estate plan in 2010 and that Stewart had initially handled decedent's estate planning. According to Bruss, the main value of the decedent's estate consisted of her real estate parcels, which notes in the file from 2007 indicated could be worth "$500,000 plus." Bruss also testified that Stewart had told the decedent when the sixth amendment was made that the property was probably not worth as much as the decedent thought because of the housing market. In a July 9, 2010, letter sent to the decedent, Bruss stated, "As we discussed on the phone . . . please note that . . . the specific amounts you indicated you wanted the beneficiary to receive, are realized based on the evaluation of your trust assets at $1,000,000."

Bruss testified that she was not involved in the discussions that led to the December 2012 seventh amendment. The decedent had called the office and was anxious to amend the trust because she was not feeling well physically. The decedent said that she wanted to revoke her sixth amendment and wanted to add a successor trustee as a backup for appellant. Bruss and Stewart went to the decedent's home to review the seventh amendment; no one else was present.[2] According to Bruss, the decedent was short of breath but was "very on-point," and there were no competency issues. In the seventh amendment, the decedent "went back to specific bequests, meaning an exact amount everyone was supposed to get," instead of using percentages. Certain beneficiaries were eliminated, but the decedent still wanted them named with a bequest of zero. Appellant was named as the residual beneficiary, and Havarias was named as a successor trustee after appellant. Stewart went over each section of the amendment with the decedent and read it out loud to her, including the list of bequests, to get the decedent's confirmation regarding the amendment's accurate memorialization of the decedent's wishes. According to Bruss, the decedent wanted the bulk of her estate to go to appellant because the decedent

> was very proud of [appellant]'s son. I think he was one of the first college graduates in the family. And there was a discussion that he was going to be attending law school. I think he had already taken the LSAT or was doing prep work to take the law school entrance exam.
>
> And she knew that that was going to be a big financial burden for the family, for [appellant] and for her son Jeffrey. And she did say with all that [appellant] had done and that with Jeff having this pursuit that she did understand and wanted [appellant] to receive—to receive the bulk of her estate.

Jeffrey, however, was left "nothing unless [appellant] passed." The decedent "was expecting that [appellant] would help her son with that debt."

Bruss testified that she notarized the decedent's signature on the seventh amendment. The decedent never said that appellant told her what to put in the Trust, that appellant had any influence over her decisions with respect to the Trust, or that she had reviewed the seventh amendment with appellant. Neither Bruss nor Stewart reviewed the amendment with appellant

---

[2] Bruss testified that there were no discussions with appellant about the decedent amending the trust and that appellant had no input.

before it was executed. The decedent also called Bruss the following April, and Bruss reviewed the seventh amendment with her again. The decedent indicated that she did not want to make any changes.

The sole question presented to the jury after both sides had presented their proofs was whether the decedent made the seventh amendment to the Trust as a result of undue influence by appellant.[3] After deliberating, the jury returned a verdict in which it found that the seventh amendment was the result of appellant's undue influence. Based on this verdict, the probate court subsequently entered an order setting aside the seventh amendment to the Trust, removing appellant as successor trustee, and appointing Bonnie Konouchuk as the successor trustee.

Appellant filed a motion for JNOV or a new trial, arguing (1) that the testimony of appellant and Bruss successfully rebutted any alleged presumption of undue influence predicated on a fiduciary relationship between appellant and the decedent and (2) that there was no evidence of undue influence by appellant in the drafting, preparation, or execution of the seventh amendment or any other relevant document. Appellant maintained that the probate court should thus enter a judgment that appellant did not unduly influence the decedent in creating the seventh amendment. In the alternative, she argued that the jury's finding that appellant unduly influenced the decedent in the drafting, preparing, or execution of the seventh amendment was against the great weight of the evidence and that she was therefore entitled to a new trial.

Following oral argument on the motion, the probate court denied appellant's motion, explaining its rationale as follows:

> I believe that there is sufficient evidence submitted to the jury on the question of undue influence to allow the jury to answer jury question number one, the sole question, as they did. Namely, did [the decedent] make the seventh amendment to the trust as the result of undue influence by [appellant]? The answer was yes. That was the returned jury verdict.
>
> * * *
>
> So therefore at this time whether or not I would have decided the way that the jury would have decided is not the question. The question is, can I say that they had so little evidence that we have to grant a new trial? Or can I say that they had no evidence such that a judgment for, notwithstanding the verdict is appropriate. And as to those questions I say no to each. That's my decision.

The probate court further explained its belief that it was bound by the jury's verdict because the jury found that undue influence occurred after having been properly instructed that a finding of undue influence required a finding that the grantor was subjected to threats, misrepresentation,

---

[3] At the close of Martin's proofs, the probate court granted appellant's motion for a directed verdict in her favor with respect to the claims of mental incapacity, duress, and fraud because the court concluded that no evidence to support these claims had been introduced.

undue flattery, fraud or physical or moral coercion sufficient to overpower volition, such that the grantor was impelled to act against her free will.

As previously noted, the probate court also denied appellant's motion for reconsideration, and this Court granted appellant's delayed application for leave to appeal.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's denial of a motion for JNOV. *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003). The evidence and all legitimate inferences are viewed in a light most favorable to the nonmoving party. *Id*. "A motion for directed verdict or JNOV should be granted only if the evidence viewed in this light fails to establish a claim as a matter of law." *Id*.

We review a trial court's denial of a motion for new trial under the abuse of discretion standard. *Allard v State Farm Ins Co*, 271 Mich App 394, 406; 722 NW2d 268 (2006). "When a party challenges a jury's verdict as against the great weight of the evidence, this Court must give substantial deference to the judgment of the trier of fact." *Id*. "If there is any competent evidence to support the jury's verdict, we must defer our judgment regarding the credibility of the witnesses." *Id*. at 406-407.

The interpretation of a trust agreement is reviewed de novo on appeal as a question of law. *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 693; 880 NW2d 269 (2015). When resolving a dispute involving the meaning of a trust, we must ascertain and give effect to the settlor's intent, which is determined by looking at the language of the trust itself. *Id*.

## III. ANALYSIS

Appellant argues on appeal that the probate court erred by denying appellant's motion for JNOV because no evidence presented at trial to establish that the seventh amendment was the result of *undue* influence.

It is appropriate to grant a motion for JNOV under MCR 2.610 when "there was insufficient evidence presented to create an issue for the jury." *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633 (1999). A motion for JNOV should be granted with respect to an issue "if the jury was permitted to speculate" in resolving that issue. *Id*.

" 'Undue influence' exercised upon one who executes a will may become the basis for finding the will invalid if that influence took from the testator his right to freely exercise his discretion in disposing of his property." *In re Sprenger's Estate*, 337 Mich 514, 521-522; 60 NW2d 436 (1953). A trust is also "void to the extent its creation was induced by . . . undue influence." MCL 700.7406. The legal framework applicable to will contests based on alleged undue influence also applies to trust contests predicated on allegations of undue influence. See *In re Mardigian Estate*, 502 Mich 154, 165 n 6; 917 NW2d 325 (2018) (opinion by MARKMAN, C.J., for an equally divided Court).

Our Supreme Court has explained the legal principles applicable to the concept of "*undue influence*" as follows:

> To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient. [*In re Karmey Estate*, 468 Mich 68, 75; 658 NW2d 796 (2003) (quotation marks and citation omitted).]

Further, the fact that a testator was advised, persuaded, or solicited does not prove undue influence so long as the testator remained capable of acting on her own motives and free to make her own decision. *In re Hannan's Estate*, 315 Mich 102, 123; 23 NW2d 222 (1946). Undue influence "is not to be presumed but must be proved by the person seeking to have the will declared invalid and cannot be found in the desire of some person or persons to influence the testator nor in the fact that the opportunity existed for the exercise of such influence." *In re Sprenger's Estate*, 337 Mich at 522. The ultimate burden of proof to show undue influence remains throughout trial with the party asserting undue influence as a ground for challenging the testamentary instrument. *Kar v Hogan*, 399 Mich 529, 538; 251 NW2d 77 (1976). Undue influence "exists as a matter of law only where the influence is actually exerted and amounts to a constraint depriving the testator of his free agency." *In re Sprenger's Estate*, 337 Mich at 522.

In this case, there was no evidence introduced at trial to support a conclusion that the decedent acted against her free will. The testimony of appellant and Bruss established that appellant was not involved in the creation of the seventh amendment to the Trust, that appellant did not have any input regarding the terms included in the seventh amendment, that the decedent initiated the process of creating the seventh amendment, and that the decedent confirmed with Stewart and Bruss that the seventh amendment to the Trust accurately reflected the decedent's wishes. This testimony was unrebutted. There was simply no evidence from which the jury could have concluded that the decedent was actually "subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion *sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will.*" *In re Karmey Estate*, 468 Mich at 75 (emphasis added). In other words, the trial evidence tended to show only that the decedent acted according to her own free will and memorialized her own intentions in the seventh amendment to the Trust. This Court's role is to give effect to the settlor's intent. *Brown Trust*, 312 Mich App at 693. Even if appellant somehow persuaded the decedent to take a certain course of action with respect to the terms of the Trust—a theory for which there is no evidence and that rests on pure speculation grounded in the unproven assertion that appellant actually benefitted from the changes in the seventh amendment—that fact does not prove undue influence as long as the decedent remained free to make her own decision. *In re Hannan's Estate*, 315 Mich at 123; *In re Sprenger's Estate*, 337 Mich at 522. Further, no evidence was introduced at trial from which a jury could reasonably conclude that the decedent in this case was not free to act according to her own volition. Thus, viewing the evidence in a light most

favorable to the nonmoving party, there was no evidence to support a conclusion that any influence that appellant could have had on the decedent was *undue* influence, and Martin failed to meet his burden to establish his claim of undue influence.[4] *Kar*, 399 Mich at 538.

Because the evidence was insufficient to permit the jury to find that the seventh amendment was the result of appellant's undue influence, the probate court erred by denying appellant's motion for JNOV. *Attard*, 237 Mich App at 321. Accordingly, we reverse the probate court's ruling, vacate the probate court's judgment, and remand this matter for entry of an order stating that the seventh amendment was not the result of undue influence by appellant and that the seventh amendment is not invalid on that ground.[5]

---

[4] We note that in resisting this conclusion, appellee incorrectly relies on the presumption of undue influence that may arise in the context of a fiduciary relationship with the grantor; it appears that the probate court was also incorrectly fixated on this presumption. Our Supreme Court has explained that the "presumption of undue influence is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction." *Kar*, 399 Mich at 537. However, "[t]he ultimate burden of proof in undue influence cases does not shift; it remains with the plaintiff [asserting undue influence] throughout trial." *Id*. at 538, 539. Moreover, this presumption is rebuttable and may be effectively rebutted by evidence showing that despite the operation of the presumption, the grantor nonetheless acted according to the grantor's own free will. See, e.g., *id*. at 537-538, 542-543; *Brown Trust*, 312 Mich App at 703-704.

In this case, assuming without deciding that the probate court properly determined that the elements of the presumption of undue influence had been established and appropriately applied the presumption in denying appellant's motion for a directed verdict that was made at the close of Martin's proofs, the presumption was nonetheless rebutted by the evidence that the decedent acted of her own free will in making the seventh amendment and the corresponding total lack of evidence that her volition was overcome, such that no reasonable jury could conclude that the seventh amendment was the result of *undue* influence. Thus, the probate court should have granted appellant's motion for JNOV. *Kar*, 399 Mich at 537-538, 542-543; *Brown Trust*, 312 Mich App at 703-704.

We additionally note that the jury was not given any instruction directed at application of the presumption of undue influence in this case. The probate court's jury instructions on the law regarding undue influence were consistent with the applicable law as set forth in this opinion.

[5] Based on our resolution of this issue, there is no need to consider appellant's remaining arguments because there is no further relief we may grant and those arguments are therefore moot. "An issue is deemed moot when an event occurs that renders it impossible for a reviewing court to grant relief." *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). "As a general rule, an appellate court will not decide moot issues." *Id*.

Vacated and remanded for the trial court to enter judgment in favor of appellant. We do not retain jurisdiction. Appellant, having prevailed, may tax costs. MCR 7.219(A).

/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello